725 So.2d 1209 (1999)
James Hayden JOHNSON, Jr., Appellant,
v.
Nancy Sebek JOHNSON, Appellee.
Nos. 97-2203, 97-3603 and 98-160.
District Court of Appeal of Florida, Third District.
January 13, 1999.
Rehearing Denied March 10, 1999.
*1210 William A. Daniel, Jr.; Cynthia L. Greene, Miami, for appellant.
Richman Greer Weil Brumbaugh Mirabito & Christensen; Ross & Tilghman and Lauri Waldman Ross, Miami, for appellee.
Before COPE, GREEN, and FLETCHER, JJ.
GREEN, J.
This is a consolidated appeal from a final judgment of dissolution of marriage and a post-decretal order, namely, an order denying the appellant's motion for disqualification of the trial judge.[1] Based upon our review of the record, we find no reversible error in either the judgment or the post-decretal order under review. Accordingly, we affirm.

I
The appellant, James H. Johnson, Jr. (or husband), and the appellee, Nancy Sebek Johnson (or wife), met in 1981. At that time, he was a successful general contractor who owned two homes in Coconut Grove, a vacant parcel of land in Maryland, a sports car, two boats, a steel construction company and an affiliated company. She was a receptionist/clerical worker who owned no assets of substantial significance. When they decided to wed a year later, in 1982, James insisted that Nancy execute a prenuptial agreement, in an effort to protect his existing business interests. Accordingly, James had his attorney prepare a prenuptial agreement which in its entirety, read as follows:
WHEREAS, JAMES HAYDEN JOHNSON, JR. and NANCY GAIL SEBEK expect to be married in the near future, and
WHEREAS, NANCY GAIL SEBEK may, as a result of such marriage, if she survives JAMES HAYDEN JOHNSON, JR. as his wife, acquire certain rights in the Estate of JAMES HAYDEN JOHNSON, JR., and
WHEREAS, JAMES HAYDEN JOHNSON, JR. has advised NANCY GAIL SEBEK of his assets and the nature and amount of his income, and
WHEREAS, NANCY GAIL SEBEK has agreed to accept the provisions of this Agreement in lieu of all marital rights in the property now owned or hereafter acquired individually by JAMES HAYDEN JOHNSON, JR. or in his Estate or upon his death wherein she would otherwise acquire rights as the surviving spouse,
NOW, THEREFORE, in consideration of the pending marriage of the parties and the covenants and promises set forth below, the parties hereto agree as follows:
1. Within sixty (60) days after their marriage, JAMES HAYDEN JOHNSON, JR. will take out one or more policies of term insurance on his life in the face amount of $100,000. Each such policy shall designate NANCY GAIL SEBEK as primary beneficiary and shall provide for the outright payment to her of the full principal sum upon the death of JAMES HAYDEN JOHNSON, JR. Each such policy may provide for an alternate beneficiary or beneficiaries in the event NANCY GAIL SEBEK does not survive JAMES HAYDEN JOHNSON, JR. So long as NANCY GAIL SEBEK and JAMES HAYDEN JOHNSON, JR. remain husband and wife, JAMES HAYDEN JOHNSON, JR. will pay all premiums due on all policies, will otherwise keep said policies in force and effect, and will not assign same or change the primary beneficiary in such policies.
2. NANCY GAIL SEBEK hereby waives and releases all statutory rights that she may have as the surviving spouse *1211 in the property or Estate of JAMES HAYDEN JOHNSON, JR. including (a) the right to elect to take against the provisions of any Will of JAMES HAYDEN JOHNSON, JR., whether heretofore or hereafter made, and (b) the right to take a distributive share in the event of the death of JAMES HAYDEN JOHNSON, JR. intestate, and (c) the right to share in the Estate of JAMES HAYDEN JOHNSON, JR. by way of dower, widow's allowance or otherwise, and (d) the right to act as Personal Representative of the Estate of JAMES HAYDEN JOHNSON, JR.
3. In the event that the marriage of the parties hereto shall be terminated by dissolution of marriage, annulment or other such proceeding, then NANCY GAIL SEBEK hereby agrees that all property and assets owned by JAMES HAYDEN JOHNSON, JR. upon the date of their marriage shall not be the subject of any claim by her and shall not be considered by any Court having jurisdiction over such proceeding with regard to establishment of alimony or other payments sought in connection with any such proceeding. The parties agree that all property hereafter acquired by them jointly as husband and wife during their marriage, other than items related to the business now or hereafter engaged in by JAMES HAYDEN JOHNSON, JR., shall be divided by them as agreed or determined by the Court having jurisdiction thereof or belong to the survivor of them if either should die during the marriage.
4. NANCY GAIL SEBEK, at the request of JAMES HAYDEN JOHNSON, JR., will execute, acknowledge and deliver any other instruments necessary to carry out the purposes of this agreement.
Nancy, who was unrepresented by legal counsel, executed this agreement along with James and the parties were married one month later.
After their marriage, the parties had one minor child and otherwise enjoyed a lavish lifestyle, owning expensive clothing, furs, automobiles, jewelry and boats. The couple frequently vacationed in Colorado and St. Croix. During the course of the marriage, the parties also acquired eleven parcels of rental property, ten of which were titled solely in James' name and the remaining property was titled solely in Nancy's name. The trial court found that immediately after the parties' acquisition of the rental real estate and prior to the birth of the minor child, Nancy handled all of the matters involving the management of this real estate, including the rental of these properties, collection of rents, tenant matters, cleaning and maintenance matters, and the payment of mortgages and related expenses.

II
In 1996, Nancy filed a petition for the dissolution of the marriage. The trial was bifurcated, and a separate trial was conducted solely on the validity of the prenuptial agreement. The agreement was found to be valid and the second phase of the trial commenced on the remaining dissolution issues. Among the issues to be decided were the equitable distribution of the assets acquired during the course of the marriage, James' claim that his personal guaranties of his corporate debt were marital liabilities, and the amount of his child support in terms of his most recent income. With regard to the latter issues, James testified that his business entities had recently suffered severe financial setbacks and that his businesses had taken out a $500,000 loan and a $250,000 line of credit, both of which he had personally guarantied during the marriage. At the time of trial, James' accountant had not yet prepared his 1996 personal or business tax returns. In lieu thereof, James submitted a W-2 form, which showed his 1996 income to be $76,000, as well as a financial affidavit. His tax return for the year preceding the trial (i.e., 1995) reflected a total income of $149,288. Nancy's accountant testified, however, that James' available cash for all purposes in 1995 was $213,078.
At the conclusion of the trial, the judge asked the parties to submit proposed final judgments. The parties did so on April 28, 1997. The court orally announced its ruling on May 2, 1997, via a telephone conference call to both parties. The final judgment was thereafter rendered on July 22, 1997. In it, *1212 the court found that the prenuptial agreement did not contain a specific operative provision concerning the disposition of property acquired by the parties during the course of the marriage, but titled in their individual names. Thus, the trial court found that the eleven rental properties were marital assets subject to equitable distribution. The court also found that since the parties' separation, James had made "outrageous" expenditures on himself and his home while claiming to be financially strapped for funds. For the purpose of determining child support, the court relied upon James' 1995 income information, as it found James' stated 1996 income not to be "reliably ascertainable." In particular, the court rejected his 1996 financial affidavit as unreliable because it showed James to be a union scale wage laborer. Finally, the court determined James' business debts to be nonmarital debts, even though they were personally guarantied by him during the marriage.
On November 25, 1997, and December 22, 1997, James made motions to disqualify the trial judge. In the first motion, he averred that he believed that he could not receive a fair trial from the court because of his perceived prejudice of the court against him. He also contended that the final judgment was identical to the proposed final judgment submitted on behalf of Nancy. This motion was denied. In the second motion for disqualification, he essentially asserted that he believed that the trial court had abdicated its role as a neutral arbiter of the facts and taken up the role as Nancy's advocate during the proceedings. His second motion was similarly denied. This appeal followed.

III
Although James raises numerous issues on appeal, he primarily argues that the trial court erred, as a matter of law, in construing the terms of the prenuptial agreement to be inapplicable to the eleven parcels of rental property acquired during the marriage. Specifically, the court concluded that although in one of the prefatory "whereas" clauses to the agreement, Nancy agreed to accept the provisions of the agreement in lieu of all marital rights to property presently owned or thereafter acquired individually by James, the agreement contained no specific operative provision as to the disposition of property acquired during the marriage but titled in the individual names of the parties. James maintains that Nancy's waiver of marital rights to property then owned or thereafter acquired individually by him in the prefatory clause is controlling; and thus, the ten parcels of rental property individually titled in his name should be declared his separate property and not subject to equitable distribution. We disagree with this construction of the prenuptial agreement.
First of all, both parties stipulate, and we agree, that their prenuptial agreement is unambiguous and, as such, it is subject to a de novo review by this court as a matter of law. See Levitt v. Levitt, 699 So.2d 755, 756-57 (Fla. 4th DCA 1997); Ballantyne v. Ballantyne, 666 So.2d 957, 958 (Fla. 1st DCA 1996). That said, we do not agree that the prefatory recitations contained in the various "whereas" clauses are binding, operative provisions to this otherwise unambiguous contract. According to Black's Law Dictionary, "[a] `whereas' clause of a contract is but an introductory or prefatory statement meaning `considering that' or `that being the case', and is not an essential part of the operating portions of the contract.". Black's Law Dictionary 1596 (6th ed.1990); see also Jones v. City of Paducah, 283 Ky. 628, 142 S.W.2d 365, 367 (Ky.1940). Consistent with this definition, courts in other jurisdictions have routinely found a "whereas" clause to be nonbinding on the parties to a contract, and not an operative provision of an otherwise unambiguous agreement. See Atlantic Mut. Ins. Co. v. Metron Eng'g & Constr. Co., 83 F.3d 897, 899 (7th Cir.1996) ("Under Illinois law introductory language or recitals are not binding obligations `unless so referred to in the operative portion of the instrument as to show a design that they should form a part of it.'") (citations omitted); Grynberg v. FERC, 71 F.3d 413, 416 (D.C.Cir.1995) ("[I]t is standard contract law that a Whereas clause, while sometimes useful as an aid to interpretation, `cannot create any right beyond those arising from the operative terms of the document.'") (citation omitted); KMS Fusion, Inc. v. United States, 36 Fed. Cl. 68, 77 *1213 (1996), aff'd, 108 F.3d 1393 (Fed.Cir.1997) ("Although `whereas' clauses generally are not considered `contractual' and cannot be permitted to control the express provisions of the contract, recitals may be read in conjunction with the operative portions of a contract in order to ascertain the intention of the parties."); Trecom Bus. Sys., Inc. v. Prasad, 980 F.Supp. 770, 773 (D.N.J.1997) ("A recital of intent in a `whereas' clause cannot create any right beyond those established by the operative terms of the contract."); Olympic Chevrolet, Inc. v. General Motors Corp., 959 F.Supp. 918, 923 (N.D.Ill.1997) ("`[I]ntroductory language or recitals are not binding obligations unless so referred to in the operative portion of the instrument.'") (citations omitted); Engineered Data Prods., Inc. v. Nova Office Furniture, Inc., 849 F.Supp. 1412, 1417 (D.Colo.1994) ("Recitals and titles, not being strictly part of the contract, cannot extend contractual stipulations, though they may have material influence on the construction of the instrument and the determination of the parties' intent."); Coca-Cola Bottling Co. of Minn., Inc. v. Coca-Cola Co., 164 F.Supp. 293, 301 (D.Minn.1957) ("There is no need to resort to the language of the whereas clauses when the body of the contract is plain and unambiguous as to the rights which plaintiff received. It is well established that recitals do not govern the operative provisions of a contract unless the operative provisions are ambiguous."); see also Rosenberg v. Rosenberg, 232 Ga. 725, 208 S.E.2d 824, 825 (Ga.1974) (holding the recital clause will not control the operative portion thereof). Under Florida law, an operative clause of an agreement prevails over the recital clause when there is a discrepancy between the two. See Northern Trust Co. v. King, 149, Fla. 611, 149 Fla. 611, 6 So.2d 539, 540 (1942); Mead v. Mead, 193 So.2d 476, 478-79 (Fla. 3d DCA 1967).
James relies upon the case of Golden West Baseball Co. v. City of Anaheim, 25 Cal.App.4th 11, 31 Cal.Rptr.2d 378 (Cal.Ct. App.1994), in support of his contention that the subject recital provision of the prenuptial agreement was not merely a recital clause but an operative provision of the contract. We find his reliance upon this decision to be misplaced. In that case, although the California Court of Appeal construed the recital clause of a contract between a baseball club and the City of Anaheim to be a binding operative provision of the agreement, it was guided in large part to do so because of the numerous ambiguities surrounding the operative provisions of the agreement. Even under the previously cited Florida law and laws of other jurisdictions, courts may resort to the language of recital clauses if the operative provisions are ambiguous. The operative provisions in the prenuptial agreement before us can hardly be deemed ambiguous and indeed the parties have so stipulated. There is thus no need for us to look to the recital provisions of the agreement in order to ascertain the meaning of its binding operative provisions.
When we turn to the operative provisions of the agreement, we conclude that the trial court correctly determined that the only operative provision of the agreement which addresses assets acquired during the marriage specifically makes such assets subject to equitable distribution. As the court finds in its final judgment:
* * * *
17. The Agreement contains no specific operative provision as to the disposition of property acquired during the marriage but titled in the individual names of the parties (which pursuant to Florida Statute 61.075 would be marital assets). This would include the ten parcels of real estate titled in the Husband's name and the one parcel titled in the Wife's name. The only operative language dealing with assets acquired during the marriage divides them. The prenuptial agreement was written after the establishment by the Supreme Court of Florida of equitable distribution of marital assets regardless of how they are titled in the landmark decision of Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980). As established at the hearing on the validity of the Prenuptial Agreement, it was written by Husband's counsel while Wife did not have counsel. The Court cannot assume that Husband's counsel was unaware of the equitable distribution development *1214 of Florida law, particularly since it had occurred two years before this Agreement was executed.
18. Based upon the unambiguous language of the parties' prenuptial agreement, considered in total and as it specifically relates to the provision regarding dissolution of marriage, and all other circumstances and the case law that existed at the time of execution of this Agreement, the Court finds that it does not address the issue of distribution of marital assets acquired during the marriage and individually titled. Thus, the Court finds that the eleven parcels of real estate which fall within this ambit are marital assets subject to equitable distribution by this Court. As acknowledged by counsel, this should be an equitable distribution.

* * * *
We find the fifth district's decision in Cameron v. Cameron, 591 So.2d 275 (Fla. 5th DCA 1991) to be strikingly similar to this case. In Cameron, the parties had a prenuptial agreement which contained both introductory and operative clauses. The introductory clause provided:
[I]t is the intention of [wife] to waive, relinquish and bar her rights of dower and other statutory rights and interests as wife or widow of [husband] in and to real, personal and mixed property owned by [husband] at the present time or to be acquired by him in the future.
Id. at 276. As in the instant case, the operative provisions did not address property acquired during the marriage and titled in one spouse's name, but stated only:
Each agrees that the other may keep and retain what was his or her own property before marriage, and each agrees to execute, in favor of the other, such quitclaim deeds or other release or conveyance as may be required to carry out the purposes hereof.[2]
Id. The husband and wife in Cameron kept separate business incomes and also engaged in a series of real estate investments. As in the instant case, the parties were not able to trace the source of the funds used to purchase the properties. The trial court concluded that the prenuptial agreement did not encompass marital assets acquired during the parties' marriage, but found that the operative paragraph dealt only with shielding from the other party his or her assets owned prior to marriage. The wife testified that she understood the primary purpose of the agreement was to shelter the husband's successful plumbing company, and that she thought she would be able to share in the profits from the real estate ventures entered into during the marriage. The Fifth District found this to be a "plausible interpretation of the agreement," and thus found that the properties were properly found by the trial court to be subject to equitable distribution. Id. at 277-78.
In its holding, the fifth district did not explicitly address why the introductory paragraph stating that the wife waived her rights to future property acquired by the husband was inapplicable. We think, however, that implicit in the court's holding was a recognition by the court that the operative provision simply trumped the introductory paragraph. Thus, where assets acquired during the marriage were not addressed in the agreement, the court concluded that a reasonable interpretation of the agreement was that it was put in place to protect the husband's considerable premarital assets and any appreciation in value of those assets occurring during the course of the marriage. Similarly, we think that such an interpretation of the prenuptial agreement in the instant case is equally reasonable. Based upon the operative provisions of this unambiguous agreement, we therefore conclude that the trial court correctly determined that the eleven rental properties acquired during the parties' marriage were subject to equitable distribution as marital assets.

IV
As his next challenge to the final dissolution judgment, James asserts that the *1215 trial court erred or abused its discretion in not declaring his personally guarantied debt on his non-marital corporate entities to be marital debt. We disagree. The trial court correctly determined that where the corporate entities in question had been excluded as marital assets under the prenuptial agreement, any debt incurred by such entities must similarly be deemed non-marital in nature, and that the husband's personal guaranty of such debt during the marriage did not otherwise convert it into marital debt. See Cameron, 591 So.2d at 276 (holding where the prenuptial agreement shielded the husband's premarital businesses from the parties' marital assets, it similarly also shielded any appreciation in value of such business assets from the wife's claims). Moreover, the husband's personal guaranty of the corporate debt was only secondary and contingent upon the default of the borrower. See Ulrich v. Ulrich, 603 So.2d 78, 79 (Fla. 2d DCA 1992); Department of Rev. v. Sun Bank, 556 So.2d 1154, 1155 (Fla. 5th DCA 1990). In this case, because the loans to the husband's corporations are not in default, the contingency has not occurred and his personal liability has not been triggered. We therefore affirm on this point as well.

V
James further asserts that the trial court abused its discretion in basing the child support award upon his 1995 income tax return, rather than the 1996 income information he provided. The trial court essentially found James' 1996 income information to be less credible than his 1995 income tax return. There is no basis for us to second guess the trial court's credibility call on this issue, see Shaw v. Shaw, 334 So.2d 13, 16 (Fla.1976); Lamas v. Lamas, 660 So.2d 765 767 n. 2 (Fla. 3d DCA 1995), particularly where there is substantial competent evidence in the record upon which the court could have relied to base its support award on the father's 1995 income tax return.
As the wife correctly points out, "Florida case law has long recognized that self-employed spouses, in contrast to salaried employees, have the ability to control and regulate their income. Their testimony, tax returns, and business records accordingly may not reflect their true earnings, earning capacity, and net worth.". Ugarte v. Ugarte, 608 So.2d 838, 840 (Fla. 3d DCA 1992) (citations omitted); see also Anderson v. Anderson, 451 So.2d 1030, 1031 (Fla. 3d DCA 1984). Furthermore, income can be imputed to a spouse although the source of that income cannot be clearly established, where that spouse provides a particular standard of living for his or her family for several years. See Seitz v. Seitz, 471 So.2d 612, 614 (Fla. 3d DCA 1985); Bucci v. Bucci, 350 So.2d 786, 789 (Fla. 3d DCA 1977). In such a case, "the court is justified in holding that he has funds which are not visible.". Bucci, 350 So.2d at 789. (citations omitted)
In this case, there was evidence which obviously caused the trial court to view James' 1996 financial information with some degree of skepticism. For example, James' financial affidavit showed him as a union scale wage laborer when his own testimony at trial contradicted this. Nancy's accountant testified that James' 1996 W-2 forms included wages but not dividends. Further, there was evidence that James made extensive, extravagant post-separation personal expenditures on himself, while at the same time, he was claiming to be experiencing severe financial setbacks with his businesses. The trial court acted well within its discretion in rejecting James' proffered 1996 income statements for purposes of the child support award and we affirm this point as well.

VI
James next argues that the trial court somehow abdicated its responsibility by adopting the wife's proposed final judgment, without first announcing its ruling. We find that the record negates this argument. The court did in fact announce its oral pronouncements four days after the trial via a telephone conference call to the parties. Where, as here, the trial court had orally announced its findings and rulings to the party after the hearing, we do not believe that the court's subsequent written final judgment is subject to attack even where it ultimately incorporates *1216 many of the findings proposed by one of the parties. See Cornett v. Cornett, 713 So.2d 1083 (Fla. 2d DCA 1998) (criticizing trial court's procedure of adopting various proposed findings by the parties without first making its own independent pronouncements); Waldman v. Waldman, 520 So.2d 87, 88 n. 4 (Fla. 3d DCA 1988) (criticizing the trial court's verbatim adoption of a proposed judgment submitted by one of the parties without first announcing its ruling).

VII
Finally, we briefly turn to the denial of James' motions for the disqualification of the trial judge. Assuming, without deciding, the timeliness of these motions, we conclude that they were properly denied as legally insufficient. Our review of these motions reveals that James was essentially complaining about receiving adverse rulings from the trial court. Florida law has clearly established that the receipt of adverse judicial rulings is a legally insufficient basis for the disqualification of the trial judge. See Jackson v. State, 599 So.2d 103, 107 (Fla.1992).
Thus, finding no reversible error for all of the foregoing reasons, we affirm both the final judgment and the post-decretal order under review.
Affirmed.
NOTES
[1] Although it is noted in the initial brief that the appellant is also seeking review of a post-decretal order requiring the temporary escrow of his tax refund, we note the absence of any further argument as to why this order was erroneous or an abuse of the trial court's discretion. In the absence of any such argument, we deem the appeal of this order to be abandoned. See Simkins Indus., Inc. v. Lexington Ins. Co., 714 So.2d 1092, 1093 (Fla. 3d DCA 1998); Raskin v. Community Blood Centers of South Fla., Inc., 699 So.2d 1014, 1016-17 (Fla. 4th DCA 1997).
[2] The remaining operative provisions of the agreement addressed alimony and expenses related to the marital residence.