PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

--------------
No. 98-4213
--------------

D. C. Docket No. 96-0013-CIV-GRAHAM

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
08/31/99
THOMAS K. KAHN
CLERK

CAPTAIN MARK ROSE, Captain,

Plaintiff-Counter-defendant-
Appellant-Cross-appellee,

versus

M/V "GULF STREAM FALCON," her
engines, tackle, appurtenances, etc.,
Official Number 585709, *in rem*,

Defendant-Counter-Claimant
Appellee-Cross-Appellant.

ALDEN HANSON, her owner, *in personam,*

Claimant-Appellee-Cross-
Appellant.

-----------------------------------------------
Appeals from the United States District Court
for the Southern District of Florida
-----------------------------------------------

**(August 31, 1999)**

Before BIRCH and CARNES, Circuit Judges, and MILLS*, Senior District Judge.

---

*Honorable Richard Mills, Senior U.S. District Judge for the Central District of Illinois, sitting
by designation.

RICHARD MILLS, Senior District Judge:

In this case, we review the district court's interpretation of a contract entered between the parties in which Captain Rose purportedly waived his maritime lien on the boat, *Gulf Stream Falcon*.

For the following reasons, we reverse the decision of the district court and remand for further proceedings.

## I.  Background

In 1989,  Alden Hanson purchased a boat named *Beau Southern* as an investment at the urging of a friend, who wanted to lease the boat from Hanson for a treasure hunting business.  That arrangement failed, however, and Hanson sought other investment opportunities with the *Beau Southern.*   A year later, Hanson met Captain Mark  Rose at a Diving Equipment Manufacturers' Association Convention ("DEMA").  Rose was engaged in the business of reconditioning and operating off-shore dive and excursion vessels.  Rose expressed an interest in purchasing the *Beau Southern* as a second vessel for his business because the *Beau Southern* had a similar design to his boat--the *Gulf Stream Eagle* ("*Eagle*").

Rose and Hanson also began discussing the possibility of using the *Beau Southern* for commercial scuba diving excursions in the same manner as the *Eagle*. However, Rose expressed concern over that prospect because the *Beau Southern* was

2

a treasure hunting vessel that was not fitted for commercial scuba diving purposes. Rose informed Hanson that in order for the *Beau Southern* to be a commercial scuba diving vessel, it needed major renovations.

From January 1990 to March 9, 1992, the parties attempted to negotiate a Joint Venture Agreement whereby Hanson would contribute to the vessel, Rose would renovate and operate the vessel, and both would recoup their investment and profit from the operation of the vessel. In addition, Rose wanted to use the profits from the joint venture to help him eventually to purchase the vessel.

Despite the lengthy negotiation, no written agreement was executed during that time. Nevertheless, in anticipation of an outright purchase of the *Beau Southern* by Rose, Hanson gave Rose permission to reconfigure the ship to a commercial diving vessel, and Rose began to make renovations to the *Beau Southern*. During the renovation, the *Beau Southern* was renamed as the *Gulf Stream Falcon* ("*Falcon*").

On March 10, 1992, the parties entered into the first Purchase and Sale Agreement in which Rose was to purchase the *Falcon*. Rose, however, was unable to purchase the *Falcon* due to lack of financing. On June 3, 1992, Rose and Hanson signed a second Purchase and Sales Agreement that expressly superceded the first. On the same day, Rose, Hanson, and a third-party named Buckley executed the

"Provincetown Whale-Watching Joint Venture" agreement and the Bareboat Charter.[1]

To facilitate the whale watching joint venture, Rose converted the *Falcon* from a scuba diving vessel to a whale watching vessel.

Under the agreements, Rose was to captain the *Falcon* during the whale watching excursions, and he could not be removed as captain absent gross negligent conduct. However, conflicts developed between the venturers, and Buckley and Hanson decided to remove Rose as captain of the *Falcon*. Shortly thereafter, the Bareboat Charter and the joint venture agreement were canceled.[2]

In May of 1993, Rose and Hanson once again decided to do business together[3] and decided that the *Falcon* was to be delivered to Bar Harbor, Maine for another whale watching venture. Rose was once again to captain the vessel. On May 16, 1993, just before Rose left for Maine, he signed an agreement with Hanson called the "Arcadian Operating Agreement" ("Arcadian Agreement"). The Arcadian Agreement included the following provisions:

---

[1] The Bareboat Charter is a type of a lease agreement.

[2] The district court found that Hanson breached the June 1992 Purchase and Sale agreement and dismissed his counterclaims arising out of the agreement. Hanson does not appeal the dismissals of his counterclaims.

[3] There were two other members to this joint venture -- Buzz MacIntire and Bill Grossman. However, they are not parties to this lawsuit.

3. Revenues earned in the operation of the Falcon will be distributed as follows:

. . .

    b) Payment of outstanding debt incurred by Rose in the conversion of the vessel to a whale watch vessel. Hanson will make the final determination, at his sole discretion, of which bills will be paid.

. . .

4. All parties acknowledge that payment of the above amounts impy [sic] no ownership interest or claim in the Gulf Stream Falcon or any claim against Alden Hanson for any reason.

Unfortunately, the Arcadian Whale Watching Joint Venture did not produce any profits that could be distributed to the joint venturers. As a result, Rose filed this action seeking, *inter alia,* to foreclose on the maritime lien in the amount of $334,476.17 for work done on the *Falcon*. Hanson counterclaimed for, *inter alia*, breach of contract and wrongful arrest of a vessel.

After holding several hearings and a bench trial, the district court dismissed all claims and counter-claims except Count I of the Second Amended Complaint, which related to Rose's foreclosure of maritime lien. With respect to that count, the district court found that ¶¶ 3 and 4 of the Arcadian Agreement constituted an "explicit waiver" by Rose of his maritime lien that attached prior to May 16, 1993. The district court did, however, award Rose $15,955.81 for work done after May 16, 1993.

## II. Issues

In essence, there are three issues on this appeal and cross-appeal:

(1) whether the district court erred in finding that Rose waived his maritime liens that accrued prior to May 16, 1993 ("waiver issue");

(2) whether Hanson is entitled to the first $375,000.00 from the sale of the *Falcon* pursuant to the June 3, 1992 purchase agreement ("sale issue"); and,

(3) whether the district court erred in awarding $15,955.81 for a maritime lien that arose after May 16, 1993 ("damages issue").

## III.  Discussion

Under the Federal Maritime Lien Act, a person providing "necessaries" to a vessel has a maritime lien on the vessel.  See 46 U.S.C. § 31342(a).  "Necessaries" include, *inter alia,* repairs, supplies, and towage of the vessel.  See 46 U.S.C. § 31301(4).  In this case, Rose seeks to recover costs he incurred converting the *Falcon* from a treasure hunting vessel to a commercial diving vessel.

Before we address the issues raised by Rose, we must first address Hanson's argument that Rose was never entitled to a maritime lien because he was a joint venturer and not a "stranger to the vessel."  See Hanson Brief, P.18.  It is true that joint venturers generally are not entitled to a lien for "necessaries" provided because they occupy a position akin to an owner.  See, e.g., Sasportes v. M/V SOL DE COPACABANA, 581 F.2d 1204, 1208 (5th Cir. 1978).  Conversely, a "stranger" to the vessel is entitled to a maritime lien for "necessaries" provided to a vessel because

6

a "stranger" relies on the credit of the vessel, and not on the credit of the co-venturer. See Fulcher's Point Pride Seafood v. M/V THEODORA MARIA, 935 F.2d 208, 211 (11th Cir. 1991).

Below, the district court rejected Hanson's argument because it found that there was no joint venture between the parties except during the brief period of time from June 3 to August 21, 1992. Although Hanson does not seek a review of this ruling, he revives the argument in an attempt to bolster his argument that the district court correctly found waiver. Nevertheless, since the existence of a maritime lien is a prerequisite to a waiver thereof, we will treat Hanson's argument as an appeal of the district court's ruling.

Initially, we note that the district court's finding with respect to the existence of (or lack thereof) a joint venture is a factual determination that is reviewed under the clearly erroneous standard. See Fulcher's Point Pride Seafood, 935 F.2d at 211 (citing Crustacean Transp. Corp. v. Atalanta Trading Corp., 369 F.2d 656, 660 (5th Cir. 1966)). Applying that standard to the district court's finding, we reject Hanson's argument that Rose was never entitled to a maritime lien.

First, Hanson does not explain why the district court's finding as to the nonexistence of a joint venture is clearly erroneous. To the contrary, we find that the record sufficiently supports the district court's finding. According to Rose's

testimony at trial, Rose and Hanson attempted to negotiate but failed to reach a written joint venture agreement prior to June 3, 1992--the time Rose was converting the *Falcon* from a treasure hunting vessel to a commercial diving vessel. We find that this fact alone is sufficient to support the district court's finding that no joint venture existed prior to June 3, 1992. Consequently, we also find that, notwithstanding a waiver, Rose was entitled to a maritime lien for work he performed on the *Falcon* prior to that date because he was not a joint venturer, but a "stranger to the vessel."

Having so decided, we now proceed to the issues raised by Rose.

A.    Waiver issue

In finding waiver of Rose's lien, the district court relied solely on the language in ¶¶ 3 and 4 of the Arcadian Agreement. In its Findings of Fact and Conclusions of law, the district court stated:

> Under paragraph 4 of the [Arcadian] agreement, Rose explicitly waived all claims against the Gulf Stream Falcon and Hanson. In addition, in paragraph 3(b) of the Arcadian Agreement Rose agreed that any payments for work performed on the Gulf Stream Falcon would be paid from the profits of the Arcadian Whale Watching Venture and that Hanson had the sole discretion for determining which of these costs would be paid. No payment is due under this paragraph because the Arcadian Whale Watching Venture did not produce any profit and Hanson did not otherwise determine that any of the costs should be paid.

Rose argues that the language in the Arcadian Agreement that the district court premised its finding of waiver did not constitute a waiver as a matter of law.

8

Specifically, Rose argues that ¶ 3(b) merely gave discretion to Hanson to use the profits from the Arcadian Whale Watching Venture, if any, to compensate Rose for converting the vessel from a commercial scuba diving vessel to a vessel suitable for whale watching. He is not seeking compensation for those efforts, but for labor and materials previously provided in converting the vessel from a treasure hunting vessel to a commercial scuba diving vessel. Thus, the plain language cannot be read as Rose waving his lien for costs of converting the *Falcon* from a treasure hunting vessel to a commercial scuba diving vessel.

With regard to ¶ 4, Rose argues that the provision merely governs the implication from the act of distributing the profits. Specifically, he argues that the paragraph merely suggests that Hanson's payment of profits should not be construed to suggest or imply that Rose had any claims against Hanson or the *Falcon*. In other words, the *act* of distributing profits was not to indicate one way or the other.

Lastly, Rose argues that the Arcadian Agreement is, at the very least, ambiguous. Therefore, he urges the Court to resolve ambiguities in the contract against Hanson, because Hanson drafted the document.

Not surprisingly, Hanson does not argue that the Arcadian Agreement is ambiguous. Hanson merely argues that this Court should affirm because the "whereas" clause of the Arcadian Agreement evidences Rose's intent to waive his

9

lien. The "whereas" clause states: "All parties hereto recognize and confirm that Alden Hanson is the sole owner of the Gulf Stream *Falcon* and no party has a claim against the vessel[.]"

Since the waiver issue relates to the district court's interpretation of contract language, we review the lower court's decision *de novo*. See Zaklama v. Mount Sinai Medicine Ctr., 906 F.2d 650, 652 (11th Cir. 1990). When interpreting a maritime contract, we apply Florida law pursuant to the conflicts of law principle of *lex loci contractus* --the law of the place where the contract is made. Cf. S.C. Loveland, Inc. v. East West Towing, Inc., 608 F.2d 160, 164 (5th Cir. 1979).[4]

Contract interpretation principles under Florida law require us to look first at the words used on the face of the contract to determine whether that contract is ambiguous. See Hurt v. Leatherby Ins. Co., 380 So.2d 432 (Fla. 1980); Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp., 364 So.2d 15 (Fla. Dist. Ct. App. 1978). It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls. See Green v. Life & Health of America, 704 So.2d 1386, 1391 (Fla. 1998);

---

[4] The parties do not dispute that the Arcadian Agreement was executed in Florida, nor do they dispute that Florida law should govern the contract interpretation.

Hurt, 380 So.2d at 433; see also, Arnold v. First Savings & Trust Co., 141 So. 608 (Fla. 1932).

Our plain reading of ¶¶ 3(b) and 4 of the Arcadian Agreement does not lead us to the same conclusion as the district court. We find that the operative language in the contract is unambiguous and that the plain reading of the contract does not support the district court's finding of "explicit waiver" of Rose's maritime lien. Paragraph 3 states that the "[r]evenues earned in the operation of the *Falcon* will be distributed as follows[,]" and subsection (b) places Rose's lien second on the priority list. The text merely establishes distribution priority of earned revenues if, in fact, the joint venture produces revenues. The contract lacks any language that suggests that the repayment of Rose's lien was going to be done solely through the revenues earned, or that if the joint venture produced no revenues, Rose's lien would not be paid and, thus, would be waived.

Paragraph 4 states that "payment of the above amounts impy [sic] no ownership interest or claim in the *Gulf Stream Falcon* or any claim against Alden Hanson for any reason." The most natural reading of this paragraph would suggest that it only governs the *act* of distributing the revenues as not implying an existence of a claim, and not whether such act constitutes a waiver of preexisting claims. At the very least, this paragraph is not an "explicit waiver" of any claims.

11

Furthermore, Hanson's reliance on the "whereas" clause is misplaced for two reasons: First, under Florida law, such "whereas" or other prefatory clauses are not binding. See Johnson v. Johnson, 725 So.2d 1209, 1212 (Fla. Dist. Ct. App. 1999) ("[W]e do not agree that the prefatory recitations contained in the various "whereas" clauses are binding, operative provisions to this otherwise unambiguous contract.") *A priori*, even if we were to construe the "whereas" clause as a waiver, Rose was not bound by it. Second, although the "whereas" clause may be evidence of parties' intent, we need not even look to the "whereas" clause if the operative portion of the contract is unambiguous. See id. at 1213. As we stated before, we find that the language in ¶¶ 3(b) and 4 is unambiguous and, thus, decline to consider the "whereas" clause as evidence of Rose's intent to waive his lien.[5]

In sum, we see nothing in the language of ¶¶ 3(b) or 4 which suggests that Rose waived his maritime lien on the *Falcon*. Accordingly, we conclude that the district court erred in finding waiver.

B.    Sale Issue

Rose argues that the district court erroneously ruled that Hanson was entitled to the first $375,000.00 from the sale of the *Falcon* pursuant to paragraph 9 of the

---

[5] We also note that the district court did not rely on, or even mention, the "whereas" clause in its findings of fact and conclusions of law.

June 3, 1992 purchase agreement. He argues that Hanson should not be able to enforce the provisions of the June 3, 1992 purchase agreement because Hanson breached that contract.

Hanson, on the other hand, argues that we should not consider this argument because Rose failed to raise it in the district court. See Technical Coating Applicators, Inc. v. United States Fidelity and Guaranty Co., 157 F.3d 843, 846 (11th Cir. 1998) (declining to consider an argument on appeal because the district court did not have an opportunity to address the argument.) We agree.

Because the district court primarily based its ruling on the waiver issue, the district court did not make a finding as to whether Hanson was entitled to the sales proceeds.[6] Further, we note that the district court dismissed Hanson's counterclaim for breach of contract and never reached the issue of the parties' rights under the June 3, 1992 purchase agreement.    Accordingly, we need not address this argument.

C.    Damages issue

---

[6] In its Findings of Fact and Conclusions of Law, the district court stated:
    As mentioned above, the Court has found that Hanson breached the June 1992 Purchase & Sales Agreement. Under paragraph 9 of that agreement, Rose was entitled upon the default by Hanson, to make a claim against the Gulf Stream Falcon and after Hanson received the first $375,000 from that sale.
    This claim would have been valid had Rose not subsequently executed the Arcadian Operating Agreement.

13

Hanson appeals the district court's award of $15,955.81 to Rose for liens that attached on the *Falcon* after May 16, 1993. He argues that the evidence at trial only supports an amount of $4,466.65. Specifically, Hanson points to Rose's cross-examination testimony, during which Rose testified that some of the amounts included in the $15,955.68 were actually incurred prior to May 14, 1993, but were posted after May 16, 1993.

Regardless of when the amounts were incurred and posted, Hanson's argument is rendered moot by our decision today. Since we hold that Rose did not waive his liens by signing the Arcadian Agreement on May 16, 1993, the case must be remanded for recalculation of the lien amount.

## V. Conclusion

We find that the district court erred in interpreting ¶¶ 3(b) and 4 of the Arcadia Agreement as an explicit waiver of Rose's maritime lien. Accordingly, we REVERSE the district court's finding of waiver and REMAND for further proceedings in accordance with this opinion.