**In re GRUBBS CONSTRUCTION COMPANY, Debtor.**

No. 03–08573–8W1.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Aug. 18, 2005.

David S. Jennis, Chad S. Bowen, Jennis & Bowen, P.L., Tampa, FL, for Debtor.

Michael P. Brundage, Hill, Ward & Henderson, P.A., Tampa, FL, for Movant, Dial One, LLC.

Steven M. Berman, Berman and Norton Breman, a Professional Association, Tampa, FL, for SouthTrust Bank.

Kenneth G.M. Mather, Hinshaw & Culbertson, Tampa, FL, for Banc One Leasing Corporation.

Benjamin Lambers, Tampa, FL, Office of U.S. Trustee.

## MEMORANDUM OPINION ON MOTION FOR SUMMARY JUDGMENT ON SOUTHTRUST BANK'S MOTION TO REPLACE GRUBBS CONSTRUCTION COMPANY'S DISBURSING AGENT

MICHAEL G. WILLIAMSON, Bankruptcy Judge.

In this confirmed chapter 11 case, Wachovia Bank National Association, successor by merger to SouthTrust Bank ("SouthTrust"), seeks removal of R. Victor Taglia ("Taglia") as disbursing agent under the chapter 11 plan ("Grubbs Plan") of the debtor, Grubbs Construction Company ("Grubbs"). A similar motion was filed by Lindell Investments, Inc. ("Lindell"), in the case of Sun West Acquisition Corporation, a subsidiary of Grubbs ("Sun West").

Prior to its chapter 11 case, Grubbs was a general contracting firm specializing in road building. During the course of the chapter 11, Grubbs completed its outstanding contracts and began the process of liquidating its assets to pay its creditors. Taglia served as chief financial officer of the company during the chapter 11. Under Grubbs Plan, the process of liquidation of these assets will be completed and the proceeds will be disbursed to Grubbs' creditors by Taglia, as the post-confirmation disbursing agent.

In addition to serving as disbursing agent in the Grubbs chapter 11 case, Taglia serves as chief restructuring officer of Grubbs' subsidiary, Sun West. Lindell is a prospective purchaser of Sun West's substantial mining real estate assets ("Sun West Mine"), which, under the Sun West plan ("Sun West Plan"), are to be sold to pay Sun West's creditors. Lindell has apparently been frustrated by Taglia's refusal to entertain Lindell's offer to purchase the Sun West Mine.

In response, Lindell purchased a small claim in the Sun West case to acquire standing to seek removal of Taglia. Unfortunately from Lindell's perspective, the claim it purchased had already been paid in full. Accordingly, this Court denied Lindell's motion to remove Taglia in the Sun West case due to lack of standing.

The attorney for Lindell is also the attorney for SouthTrust and has filed the virtually identical motion in the Grubbs case on behalf of SouthTrust. Unquestionably, SouthTrust does have standing in the Grubbs case as SouthTrust was the major secured creditor during the chapter 11 case, and while no longer holding any secured claim as a result of the Debtor's surrender to SouthTrust of its collateral under the confirmed plan, it has a substantial unsecured claim—alleged by SouthTrust to be in the $4 million range.

SouthTrust contends that Grubbs has a claim against the Sun West estate in excess of $5 million ("Inter–Company Receivable"). If this is so, it would appear that Taglia has a conflict of interest, because he serves as both the chief restructuring officer of Sun West and disbursing agent for Grubbs—crucial roles for two adverse parties. SouthTrust's main contention is that Taglia has failed to take steps to collect the Inter–Company Receivable owed by Sun West to Grubbs. This would put pressure on Sun West to sell the Sun West Mine—the only source of repayment of any outstanding claim owed by Sun West to Grubbs. SouthTrust claims that on account of its status as a general unsecured creditor in the Grubbs case, it has an interest in any potential claim Grubbs may assert against Sun West.

On the other hand, if there is no debtor-creditor relationship between Sun West and Grubbs, then there is no conflict of interest and no grounds for removal of Taglia from his position as disbursing agent in this case. Accordingly, the threshold issue to be decided by the Court is whether there exists a debtor-creditor relationship between Grubbs and Sun West. For the reasons discussed below, the Court concludes that there is no debtor-creditor relationship between Grubbs and Sun West and grants summary judgment in favor of movants.

### Factual and Procedural Background

#### 1. The Inter–Company Receivable

The documents filed in both the Grubbs and Sun West cases vary in describing the amount owed by Sun West to Grubbs. In its schedules, Sun West lists Grubbs as the holder of two claims: one for a loan in the amount of $5,000,000 and the other for a working capital loan in the amount of $119,000. The balance sheet attached to the disclosure statement accompanying the

Sun West Plan ("Sun West Disclosure Statement") lists under liabilities "L/T Note–Grubbs Investment" in an amount of $5,000,000. The Sun West Disclosure Statement states that Grubbs has a claim of $5,000,000, owing from the money advanced for the down payment on the Sun West mines. Sun West Disc. Stat., § IV.1, at 8, § V.1, at 10.

In its schedules, under accounts receivable, Grubbs lists Sun West as owing $835,739.17 and $62,667.53. The disclosure statement accompanying the Grubbs Plan ("Grubbs Disclosure Statement") on the other hand states that Grubbs provided an initial $5,000,000 to Sun West to acquire the Sun West Mine. Grubbs Disc. Stat., § V.1.e., at 9. In addition, the Grubbs Disclosure Statement reflects advances by Grubbs to Sun West of $50,000 per month for two years, and $157,000 per month for three years. Grubbs Discl. Stat., § VI, at 12. This totals $6,852,000 advanced by Grubbs to Sun West which, when added to the initial $5,000,000, reflects an intercompany liability of $11,852,000.

From these documents, it appears that Grubbs held an Inter–Company Receivable payable by Sun West in an amount as low as $898,406.70 and as high as $11,852,000 as of the filing of this chapter 11 case.

#### 2. *SouthTrust's Security Interests*

SouthTrust was the major secured creditor in the Grubbs case. Its claim arose out of an agreement between Grubbs and SouthTrust for a series of loans and lines of credit. To secure the loans, Grubbs granted SouthTrust a security interest in all of its personal property assets, including accounts receivable, contract rights, and general intangibles. SouthTrust has asserted its lien against a variety of general intangibles and receivables in the Grubbs case. *See, e.g.,* Motion to Intervene in Adversary Proceeding Numbered

03–708, filed by SouthTrust in Sun West case on February 5, 2004, at ¶ 10 ("The Debtor owes Grubbs Construction Company $5,000,000, said receivable is subject to the lien of SouthTrust."). Grubbs has not challenged the validity or extent of SouthTrust's lien.

SouthTrust also held a claim in the Sun West case by virtue of Sun West's guaranty of Grubbs' debt to SouthTrust. This guaranty was secured by a pledge of the operating agreement under which Sun West operates the Sun West Mine.

#### 3. *Treatment of SouthTrust Claims under Grubbs Plan*

The Grubbs Plan placed SouthTrust's claims into multiple classes. The portion of the SouthTrust claim secured by Grubbs' personal property is treated in Class 3(C). Grubbs Plan, at 9. The claim will be paid from "the net proceeds of the collection of [Grubbs'] accounts receivable, contract rights, causes of action, and the liquidation of general intangibles .... Any Collateral securing SouthTrust's 3(C) Allowed Secured Claim that has not been liquidated or collected by the Effective Date will be *surrendered* to SouthTrust." Grubbs Plan, at 13 (emphasis added).

Any unsecured deficiency claim of SouthTrust is treated, along with the rest of the general unsecured creditors, in Class 17. Grubbs Plan, at 11. The Grubbs Plan gives general unsecured creditors (including SouthTrust on its potential deficiency claim) a choice between two options: (a) sharing pro rata in a "Plan Fund" (described below); or (b) sharing pro rata in new stock issued by the reorganized company. Grubbs Plan, at 17. The assets retained by the reorganized company to be owned by creditors electing option (b) consist of: (1) the interest in any emergency service contracts; and (2) the own-

ership interests in Sun West. Grubbs Plan, at 19.

With respect to its unsecured deficiency claim, SouthTrust elected under option (a) to receive a share of the Plan Fund established under Article 7 of the Grubbs Plan rather than electing to receive stock under option (b). *See* SouthTrust Ballot filed in connection with Grubbs Plan. The Plan Fund is defined under the Grubbs Plan as a fund "to which shall be transferred all Cash resulting from the liquidation of Grubbs' assets and any assets of Grubbs not liquidated or *surrendered* as of the Effective Date." Grubbs Plan, at 5 (emphasis added).

As set forth in the Grubbs Disclosure Statement, "[t]he Plan Fund will contain (a) all the assets of [Grubbs] that have not been sold prior to the Effective Date of the Plan, . . . and (b) all cash remaining from the proceeds of any sale of assets after the payment to Secured Creditors, as well as recoveries of any causes of action or avoidance actions brought by the Debtor or Disbursing Agent subsequent to the Effective Date." Grubbs Disc. Stat., at 20.

The assets that would be available to fund the payment to those creditors exercising option (a), such as SouthTrust, are specifically delineated in the Grubbs Disclosure Statement and comprise a cash amount of $250,000 which SouthTrust agreed during the case to "carve out" from its collateral, a bus, and four pieces of real estate. The Grubbs Plan does not contemplate that any accounts receivable will be available to pay unsecured claims. This is because by the terms of the Grubbs Plan, any uncollected assets securing South-Trust's Class 3(C) claim, which include accounts receivable and general intangibles, were surrendered to SouthTrust on the effective date of the Grubbs Plan. Accordingly, because the Inter–Company Receivable had not been collected as of the

Effective Date of the Plan, it was surrendered to SouthTrust. Simply put, it was never within the contemplation of the Grubbs Plan that Grubbs would retain any interest in the Inter–Company Receivable following its surrender to SouthTrust.

### 4. *SouthTrust Assignment of the Inter–Company Receivable*

It is obvious from what occurred following the date of confirmation of the Grubbs Plan that there was substantial question as to the value of the Inter–Company Receivable. As discussed in the Grubbs Disclosure Statement, after the original acquisition of the Sun West Mine it was learned that there were significant restrictions on the amount of acreage available for mining due to environmental restrictions. Grubbs Disc. Stat., at 9.

In addition, litigation was pending with the seller of the mine in which Sun West sought recharacterization of the operating agreement as a sale and mortgage. Assuming the litigation were successful from Sun West's perspective and the operating agreement were recharacterized as a mortgage, even then, the mortgage would be in excess of $25 million subject to any offsets or defenses that Grubbs may have. Grubbs Disc. Stat., at 20–21. This amount would need to be paid prior to any distribution to unsecured creditors from the sale of the Sun West Mine. Not surprisingly, in the liquidation analysis contained in the Grubbs Disclosure Statement, the liquidation value of Grubbs' "Investment in SunWest Acquisition Corp.," under the heading "SunWest Mine" was listed as "0." Grubbs Disc. Stat., Exhibit "1."

Negotiations between Sun West, Grubbs, a non-debtor affiliate, Grubbs Emergency Services, LLC ("GES"), and SouthTrust ensued—resulting in an agreement under which SouthTrust, in consideration of a payment from GES in the

amount of $50,000, agreed to transfer its claims against Sun West to GES. Specifically, on June 18, 2004, SouthTrust executed an assignment of its claims against Sun West in favor of GES ("Assignment"). Pursuant to the terms of the Assignment, SouthTrust transferred to GES its claim against Sun West arising from the guaranty Sun West gave to SouthTrust for the Grubbs debt. In addition to the South-Trust claim filed in the Sun West bankruptcy case, the Assignment further sold and assigned any and all claims or rights "[SouthTrust] may have ... against ... [Sun West] ... including, without limitation ... (iii) any claims or interests [SouthTrust] may have in or against [Sun West] by virtue of any of [SouthTrust's] rights or interests in the assets of [Sun West] corporate parent, Grubbs Construction Company." As admitted in the affidavit given by a SouthTrust representative, SouthTrust understood at the time that once the transfer was executed, South-Trust would no longer have any direct interest as a secured creditor in the Inter–Company Receivable. Affidavit of William W. Teegarden (Doc. No. 1690), ¶ 8, at 2.

As is typical in such transactions, South-Trust and the purchaser, GES, executed a mutual release ("Mutual Release"). However, the Mutual Release in no way released any claim of SouthTrust against the Grubbs chapter 11 estate, nor did it in any way affect the lien on the Inter–Company Receivable which was being transferred to GES under the Assignment.

### Conclusions of Law

#### A. Effect of Assignment

█ SouthTrust asserts that the Assignment and accompanying release given to GES only had the effect of releasing its lien on the Inter–Company Receivable. As such, it argues: (1) SouthTrust only gave up its claim to the Inter–Company Receivable as Grubbs' secured creditor; (2) this release returned the right to the Inter–Company Receivable to Grubbs; and (3) the Inter–Company Receivable is a Plan Fund asset, to which Grubbs' general unsecured creditors (including SouthTrust to the extent of a deficiency) are entitled.

█ However, the language of the Assignment does not support this position. The basic precepts of contract interpretation give effect to the plain meaning of a document, despite claims made by a party of conflicting understanding. See, e.g., *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345 (11th Cir.1999); *Green v. Life & Health of America*, 704 So.2d 1386, 1391 (Fla.1998). Additionally, the parol evidence rule bars extrinsic evidence to contradict the unambiguous language of a contract. See, e.g., *In re Yates Development*, 256 F.3d 1285 (11th Cir.2001). SouthTrust argues that it released its claim against the Inter–Company Receivable, thereby transferring it back to Grubbs. To the contrary, it is clear that the Assignment had the effect of assigning SouthTrust's rights in the Inter–Company Receivable rather than releasing it. Further, if there had been such a release, it would have been documented with language to that effect in a writing accompanying the execution of the Assignment as well as the execution of a UCC–3 release form.

Moreover, it is illogical that Sun West would negotiate with SouthTrust solely a release of the lien on the Inter–Company Receivable rather than an assignment to a friendly affiliate, GES. A release of the lien would result in no benefit to Sun West. That is, if the lien on the Inter–Company Receivable were simply released, Sun West would still remain liable to Grubbs and in turn its creditors. There would be no benefit to Sun West as it would still have to pay the Inter–Company Receivable unlike the situation that would exist if the Inter–Company Receivable

were assigned to a friendly affiliate, which is what occurred in this case.

### B. Inter–Company Receivable Under Confirmed Plan

■ Notwithstanding the contested nature of Grubbs' confirmation hearing and the numerous objections filed to confirmation, there was no objection to the treatment of SouthTrust's Class 3(C) claim or the surrender of all of the collateral described therein to SouthTrust. The Grubbs Plan was confirmed in its entirety, including the treatment of SouthTrust's Class 3(C) secured claim. As a result, as of the Effective Date of the Plan, Grubbs' estate and its unsecured creditors were divested of any interest in Grubbs' uncollected accounts receivable, accounts, general intangibles, and contract rights, including any interest in the Inter–Company Receivable. Under the provisions of the Plan, all of Grubbs' interests in that collateral were surrendered to SouthTrust.

The terms of a confirmed plan are binding on debtors and creditors. 11 U.S.C. § 1141(a) ("the provisions of a confirmed plan bind the debtor ... and any creditor ... whether or not such creditor ... has accepted the plan."). Except as may be otherwise provided in the plan, after confirmation "the property dealt with by the plan is free and clear of the claims and interests of creditors [and] equity security holders". 11 U.S.C. § 1141(c).

The Grubbs Plan unequivocally surrendered to SouthTrust all unliquidated or uncollected intangible personal property collateral, including the Inter–Company Receivable. The surrender took place upon the Effective Date. Except for the retained assets, there was no reservation of any of SouthTrust's collateral for the benefit of the estate or unsecured creditors.

■ Confirmation of the Grubbs Plan was binding upon all parties and "all questions that could have been raised pertaining to such plan are *res judicata.*" *In re Harloff,* 247 B.R. 523 (Bankr.M.D.Fla. 2000) (citing *Israel Disc. Bank Ltd. v. Entin,* 951 F.2d 311, 314 (11th Cir.1992) and *In re Justice Oaks II, Ltd.,* 898 F.2d 1544, 1550 (11th Cir.1990)). The preclusive res judicata effect of plan confirmation and transfers of property contemplated thereby apply equally to transfers to secured creditors. *See In re Harbour Oaks Dev. Corp.,* 228 B.R. 801 (Bankr.M.D.Fla. 1999) (analyzing effect of plan that transferred property to secured creditor in full satisfaction of its lien). In both *Harloff* and *Harbour Oaks,* the plan of reorganization provided that the secured creditor would receive the collateral in full satisfaction of its claims. When the creditors later attempted to recover on the claims, the attempt was denied by res judicata; the plans precluded the creditors from seeking recovery inconsistent with their treatment under the confirmed plan.

The same result follows in this case. By the terms of the Plan, SouthTrust was to receive the collateral securing its claim. Upon confirmation of the Plan, all of Grubbs' rights in SouthTrust's collateral, including the Inter–Company Receivable, were transferred by operation of law under the confirmed plan to SouthTrust. As a result of confirmation and pursuant to the treatment of SouthTrust's Class 3(C) claims, the Inter–Company Receivable was irrevocably transferred to SouthTrust as of the Effective Date. The Inter–Company Receivable is no longer available to the Grubbs estate for distribution to its unsecured creditors.

### C. Inter–Company Receivable under the U.C.C.

■ The result is the same if the treatment of SouthTrust's Class 3(C) Secured Claim is viewed under the applicable provisions of the Uniform Commercial Code

("U.C.C."). The U.C.C. authorizes strict foreclosure, under which a secured creditor can accept collateral in full or partial satisfaction of the debt secured if the debtor consents or does not object within a time certain. U.C.C. §§ 9–620, 9–622 (adopted in Florida as Florida Statutes sections 679.620, 679.622). The secured party's acceptance of collateral in partial satisfaction of an obligation "[t]ransfers to the secured party all of a debtor's rights in the collateral." Fla. Stat. § 679.622.

Both the secured party and the debtor must consent to the acceptance of collateral in satisfaction of the debt. The debtor may consent to such acceptance in "a record authenticated after default." U.C.C. § 9–620. The secured party may also consent in an authenticated record. A "record" is information inscribed on any tangible medium or stored in any other medium and retrievable in tangible form. U.C.C. § 9–102(69). "Authentication" is accomplished by executing or otherwise adopting a record with the present intent of adopting or accepting the record. U.C.C. § 9–102(7). Here the provisions of the Grubbs Plan contemplated SouthTrust's acceptance of the collateral described in Class 3(C) of the Grubbs Plan in partial satisfaction of the obligations secured. South-Trust's acceptance ballot constituted a retrievable medium adopted with the present intent to adopt.

Grubbs' proposal of the Grubbs Plan and related disclosure statement constitute both the appropriate acceptance by Grubbs of the surrender and acceptance, and the notifications to other parties required under Section 9–621 of the Uniform Commercial Code. Under section 9–622 of the Uniform Commercial Code and Florida Statutes section 679.622, SouthTrust's acceptance of the Class 3(C) collateral in partial satisfaction of its obligation transferred to SouthTrust all of Grubbs' rights in the Class 3(C) collateral.

### Conclusion

■ By operation of the express terms of the Plan and section 9–622 of the Uniform Commercial Code, all of Grubbs' rights in the Inter–Company Receivable were transferred to SouthTrust, and Grubbs' estate retained no rights in the Inter–Company Receivable. Thereafter, SouthTrust transferred the Inter–Company Receivable to GES. As such, the Inter–Company Receivable is unavailable for distribution to the unsecured creditors in this case. Not only does Taglia not have a duty to collect the Inter–Company Receivable for the unsecured creditors, he has no right to do so. Therefore, it follows that the Inter–Company Receivable cannot be the basis for a conflict of interest on the part of Taglia as the Grubbs disbursing agent.

Accordingly, a separate order shall be entered granting the motion for summary judgment filed by Dial One, LC, and GES (Doc. No. 1680), in which Grubbs joined (Doc. No. 1691), and denying SouthTrust's motion to replace Taglia (Doc. No. 1624).