**In re CARDIZEM CD ANTITRUST LITIGATION.**

**This Document Relates To All Actions.**

No. 99–MD–1278.

United States District Court,
E.D. Michigan,
Southern Division.

June 6, 2000.

Patrick E. Cafferty, Miler Faucher and Cafferty LLP, Ann Arbor, MI, for Plaintiffs Charles Zuccarini, Albert Eirich and Jan Gabriel.

Scott E. Perwin, Kenny Seymour Arnold Critchlow & Spector, Miami, FL, for The Kroger Co., et al.

Bruce E. Gerstein, Garwin, Bronzaft, New York City, for Louisiana Wholesale Drug Co., Inc., Sixteenth Street Community Health Center.

Stephen Lowey, Lowey, Dannenberg, White Plains, NY, for Betnor, Inc.

Elwood S. Simon, Elwood S. Simon Assoc., Birmingham, Mi, for Albert Eirich.

Joseph J. Tabacco, Berman, DeValerio, San Francisco, CA, for Aetna U.S. Healthcare, Aetna U.S. Healthcare of Cal., Inc.

Richard B. Drubel, Boies & Schiller, Hanover, NH, for Duane Reade, Inc.

Joseph J. Tabacco, Elwood S. Simon, Michael G. Wassmann, Lance C. Young, Elwood S. Simon Assoc., Birmingham, AL, Stephen Lowey, Lowey, Dannenberg, White Plains, NY, for State law Plaintiffs.

Joe Rebein, Shook, Hardy, Kansas City, MO, for Hoechst AG, Hoechst Aktiengesellschaft.

Craig L. John, Dykema Gossett, Bloomfield Hills, MI, Joe Rebein, Shook, Hardy, Kansas City, MO, for Hoechst Marion Roussel Inc.

Norman C. Ankers, Honigman, Miller, Detroit, MI, Colin A. Underwood, louis M. Solomon, Hal S. Lazaroff, Solomon, Zauderer, New York City, for Andrx Pharmaceuticals, Inc., Andrx Corp.

Michael D. Hausfeld, Cohen, Milstein, Washington, DC, for Eugenia Wynne Sams.

Andrew J. McGuinness, Dykema Gossett, Ann Arbor, MI, Craig L. John, Dykema Gossett, Bloomfield Hills, MI, for Aventis Pharmaceuticals, Inc.

Elwood S. Simon, Elwood S. Simon Assoc., Birmingham, Mi, Stephen Lowey, Richard W. Cohen, Lowey, Dannenberg, White Plains, NY, Angela K. Green, Niewald, Waldeck, Kansas City, MO, for Philip Neal, movant.

## ORDER NO. 13

### MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

EDMUNDS, District Judge.

State Law Plaintiffs and Sherman Act Plaintiffs [1] are before the Court on mo-

---

1. The Sherman Act Plaintiffs include all Plaintiffs in the Sherman Act class cases and the Sherman Act individual cases consolidated in this Court, Case Nos. 99–73870, 99–73259, 99–73735, and 99–75036.

tions, brought pursuant to Fed.R.Civ.Pro. 56(a), for partial summary judgment. Plaintiffs' motions raise a single issue, whether Defendants' September 24, 1997 Agreement ("HMRI/Andrx Agreement") constitutes a restraint of trade that is illegal *per se* under section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and under the various state antitrust laws at issue here. This Court answers this question in the affirmative. It concludes that the HMRI/Andrx Agreement is an agreement between horizontal competitors that allocates the entire United States market for Cardizem CD and its bioequivalents to Defendant HMRI, and thus constitutes a restraint of trade that has long been held illegal *per se* under established Supreme Court precedent. *See Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367 (6th Cir.1988). Accordingly, Plaintiffs' motions for partial summary judgment are **GRANTED.**

## I. Facts

### A. Relevant Statutory and Regulatory Framework

The manufacture and distribution of pharmaceutical drugs are regulated by the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301, et seq. (1994). Congress passed the "Hatch–Waxman Amendments" to the Act in 1984 after concluding that the Act's "cumbersome drug approval process delayed the entry of relatively inexpensive generic drugs into the market place." *Mylan Pharm., Inc. v. Shalala*, 81 F.Supp.2d 30, 32 (D.D.C.2000). The Hatch–Waxman Amendments, 21 U.S.C § 355 (1994), embody Congress' intent "to make available more low cost generic drugs" and its attempt "to balance two conflicting policy objectives: to induce name-brand pharmaceutical firms to make the investments necessary to research and develop new drug products, while simultaneously enabling competitors to bring cheaper, generic copies of those drugs to

market." *Id.* (internal quotes and citations omitted).

"[T]he Hatch–Waxman Amendments established new guidelines for the approval of generic drugs. Generic drug makers were permitted to file an Abbreviated New Drug Application ("ANDA") which incorporated data that the 'pioneer' manufacturer had already submitted to the FDA regarding the pioneer drug's safety and efficacy. In order to obtain FDA approval, the ANDA must demonstrate, among other things, that the generic drug is 'bioequivalent' to the pioneer drug". 21 U.S.C. § 355(j)(2)(A)(iv). As protection for pioneer drug makers, the applicant is also required to certify in one of four ways that the generic drug will not infringe on any patent which claims the pioneer drug. "*See id.* at § 355(j)(2)(A)(vii)." *Mylan Pharm.*, 81 F.Supp.2d at 32.

Applicable here is the fourth type of certification. Paragraph IV certification "permits the applicant to allege that the patent for the pioneer drug is either invalid or will not be infringed by the marketing of the generic drug. *See id.* at § 355(j)(2)(A)(vii)(IV)." *Mylan Pharm.*, 81 F.Supp.2d at 32. As the District Court for the District of Columbia recently observed, "[a] generic drug manufacturer's filing of a so-called 'Paragraph IV' certification has important legal ramifications. It automatically creates a cause of action for patent infringement. Upon receiving notice of a Paragraph IV certification's filing, the patent holder or pioneer manufacturer has 45 days within which to file suit against the generic manufacturer. *See id.* at § 355(j)(5)(B)(iii). If such an action is brought, the FDA cannot approve the generic manufacturer's ANDA for 30 months. *See id.* However, if the court hearing the infringement action rules before the expiration of the 30–month period that the patent at issue is 'invalid or not infringed,' then 'the approval shall be made effective on the date of the court decision[.]' Id. at § 355(j)(5)(B)(iii)(I)." *Mylan Pharm.*, 81 F.Supp.2d at 32–33.

To encourage competitors to bring cheaper generic drugs to market, and acknowledging that they will likely incur "potentially substantial litigation costs associated with challenging pioneer drug makers' patents, the Hatch–Waxman Amendments provide an added incentive for generic drug producers to file Paragraph IV certifications. The first generic manufacturer to file an ANDA containing a Paragraph IV certification with respect to a specific patent is awarded a 180–day period of exclusive marketing rights for a generic version of the drug claimed by that patent. In other words, no other ANDA for the same generic drug product will be approved during those 180 days." *Id.* at 33.

> Section 355(j)(5)(B)(iv) provides that:
>
> If the [ANDA] contains a certification described in [Paragraph IV] and is for a drug for which a previous application has been submitted under this subsection [containing a Paragraph IV] certification, the application shall be made effective not earlier than one hundred and eighty days after—
>
> (I) the date the Secretary receives notice from the applicant under the previous [ANDA] of the first commercial marketing of the drug under the previous [ANDA], or
>
> (II) the date of a decision of a court in an action described in clause (iii) holding the patent which is the subject of the certification to be invalid or not infringed,
>
> whichever is earlier.

*Id.* (quoting 21 U.S.C. § 355(j)(5)(B)(iv)). Accordingly, the 180–day period of exclusivity "can be triggered in one of two ways—either (1) when the generic producer begins commercial marketing of its drug (the 'commercial marketing trigger'), or (2) when there is a court decision finding the pioneer drug maker's patent invalid or not infringed (the 'court-decision trig-

ger')." *Mylan Pharm.,* 81 F.Supp.2d at 33 (footnote omitted).

**B. Andrx's ANDA, the HMRI/Andrx Patent Suit, ANDA Supplements, and the September 1997 HMRI/Andrx Agreement**

Prior to August 1995, Defendant Andrx had been developing its own generic version of Cardizem CD, and provided samples of its proposed generic substitute for Cardizem CD to the Hoechst Defendants so they could perform their own tests to confirm that there was no infringement of the patents claiming Cardizem CD and thus avoid litigation.

On September 22, 1995, Andrx filed its Abbreviated New Drug Application ("ANDA") No. 74–752 with the United States Food & Drug Administration ("FDA") seeking approval to manufacture and sell a generic form of Cardizem CD, a once-daily, controlled release dosage of the chemical compound diltiazem hydrochloride, manufactured and sold by Defendant HMRI.

On November 28, 1995, two months after Andrx filed its ANDA, the U.S.Patent and Trademark Office issued U.S.Patent No. 5,470,584 ("the '584 patent") to Carderm which then licensed it to HMRI. The '584 patent claims a delayed release diltiazem formulation with an in-vitro dissolution profile where from 0–45% of total diltiazem is released after 18 hours and not less than 45% of total diltiazem is released after 24 hours.

On December 31, 1995, Andrx made a Paragraph IV Certification with regard to all unexpired patents listed in the FDA's Orange Book[2] allegedly claiming Cardizem CD and certified to HMRI that the product reflected in its ANDA did not infringe the patents owned or controlled by HMRI or its affiliates, including the '584 patent.

---

2. A list of patents believed to be covered by a pioneer drug product or its use must be submitted to the FDA, and the patents are listed in a publication titled "Approved Drug Prod-

ucts with Therapeutic Equivalence Evaluations," commonly known as the "Orange Book."

On January 31, 1996, HMRI and Carderm filed a patent infringement suit against Andrx in the District Court for the Southern District of Florida ("HMRI/Andrx patent case"). The filing of the suit triggered the 30–month Hatch–Waxman waiting period, which expired on or before July 8, 1998. Thus, Andrx's ANDA could not be finally approved and it could not begin commercial marketing of its generic version of Cardizem CD until the 30–month waiting period expired or the court hearing the infringement action ruled that the patent at issue was invalid or not infringed, whichever first occurred. *See Mylan Pharm.,* 81 F.Supp.2d at 32–33.

On April 4, 1996, Andrx filed an amendment to its ANDA No. 74–752, amending the dissolution profile to provide that not less than 55% of the total diltiazem was to be released after 18 hours. HMRI was notified of this change but continued to prosecute its infringement claims against Andrx.

On September 15, 1997, the FDA issued its tentative approval of Andrx's ANDA, which was an indication that the ANDA would be approved as soon as it was legally eligible; i.e., on July 8, 1998, the date the 30 month Hatch–Waxman waiting period was due to expire, or earlier if the court presiding over the HMRI/Andrx patent infringement action ruled that the '584 patent was invalid or not infringed.

Less than ten days later, on September 24, 1997, HMRI and Andrx entered into the HMRI/Andrx Agreement. It is this Agreement that Plaintiffs assert constitutes a per se violation of § 1 of the Sherman Act.

By July 9, 1998, the FDA had granted final approval of Andrx's ANDA for a generic version of Cardizem CD, the 30 month Hatch–Waxman waiting period had expired, and Andrx was no longer restricted under the Hatch–Waxman Amendments from immediately marketing and selling its

generic drug.[3] Under the terms of the HMRI/Andrx Agreement, however, Andrx had agreed not to enter the market with its generic version of Cardizem CD, and on July 9, 1998, HMRI's obligation to begin making quarterly payments of $10 million to Andrx was triggered.

Two months later, on September 11, 1998, Andrx filed a prior approval supplement to its ANDA No. 74–752 seeking to once again change the dissolution profile of its generic drug. Specifically, Andrx sought permission to make the following change: "[i]n addition to adding a small amount of a new ingredient to the SR2 bead coating, the Prior Approval Supplement submitted on September 11, 1998 requests permission to change the current 0.1 N HC1 dissolution specification for the SR2 bead *from 'not less than 55% of the total diltiazem released after 18 hours' to 'not less than 65% of the total diltiazem released after 18 hours'".* *See* HMRI Appendix, Ex. 7 at 11 (emphasis added).

On October 7, 1998, Andrx informed HMRI that it had filed a prior approval supplement to its ANDA and urged HMRI to reconsider its infringement claims. *See* HMRI Appendix, Ex. 8, 6/9/99 Stipulation of settlement in HMRI/Andrx patent infringement action, ¶ 10; Bennett Decl. at ¶ 18; Bennett Decl., Ex. A at ¶ 15.

In January 1999, there was a flurry of activity. On January 8, 1999, HMRI wrote to Andrx suggesting that Andrx was required to file a new Para. IV certification, and on January 15, 1999, HMRI's counsel raised the same concerns with the FDA. *See* Bennett Decl. at ¶ 20. Then, on January 20 and 22, 1999, Andrx sent samples of its generic product with the new formulation to HMRI. *See* Bennett Decl., Ex. A at ¶¶ 19, 20.

On February 3, 1999, Andrx certified to HMRI that the reformulated product did not infringe the '584 patent. *See.* HMRI

---

**3.** The FDA's approval of Andrx's ANDA meant that FDA had found that the Andrx drug was "bioequivalent" to Cardizem CD and this in turn would make it possible, if not required,

for pharmacists to fill prescriptions for Cardizem CD with Andrx's generic version of that drug. *See* Decl. of HMRI expert, A. Bennett, at ¶ 6.

Appendix, June 9, 1999 Settlement Stip., Ex. 8 at ¶ 7. In its Second Supplemental Patent Certification ("Para. IV Certification"), Andrx asserted that the '584 patent would not be infringed by "the making, using or selling of the Andrx CARTIA XT because neither the Andrx CARTIA XT product nor any component of the Andrx CARTIA XT product exhibit an in-vitro dissolution profile that is the same as or equivalent to the in-vitro dissolution profile set forth in claims 1–9 of U.S. 5,470,584." HMRI Appendix, Ex. 7, Second Supplemental Patent Certification at 10.[4]

Andrx further asserted that "the claims of U.S. 5,470,584 cannot be read to include the SR2 bead in Andrx's CARTIA XT product because of *statements made by Eli Shefter regarding the scope of the claims* of U.S. 5,470,584 in paragraph 13 of the Second Declaration Eli Shefter submitted in the lawsuit, *Hoechst Marion Roussel, et al. v. Andrx Pharmaceuticals, Inc.*, Civil Action No. 96–06121 CIV–Roettger (S.D.Fla.)." *Id.* at 13 (emphasis added). Andrx explained that it was providing "[a] more detailed discussion of this point" in a separate addendum to its Second Supplemental Notice, and also explained that the addendum was being provided "only to Carderm Capital L.P. and Hoechst Marion Roussel, Inc. because Carderm Capital L.P. is the owner of U.S. 5,470,584 and the NDA for Cardizem CD and because the addendum contains confidential information Andrx obtained from Carderm Capital L.P. and Hoechst Marion Roussel, Inc. in *Hoechst Marion Roussel et al. v. Andrx Pharmaceuticals, Inc.*, Civil Action No. 96–06121 CIV–Roettger (S.D.Fla.) that is subject to the terms of a Stipulated Protective Order." *Id.* at 13–14.

In its Confidential Addendum to its Second Supplemental Patent Certification, Andrx reiterated that "all SR2 or slower release beads in the Andrx CARTIA XT product will release not less than 65% of the total amount of diltiazem after 18 hours when tested according to the conditions recited in claim 1 of the '584 patent." HMRI Appendix, Ex. 7, Confidential Addendum to Andrx's Second Supplemental Patent Certification at 1. Andrx further explained that: "[t]his dissolution specification at the 18 hour point is more than 40% greater or 20 percentage points higher than the 45% maximum recited in claim 1 of the '584 patent." *Id.* Accordingly, Andrx asserted, "[b]ased upon arguments presented by HMR and HMR's expert, Dr. Shefter, in responding to Andrx's motions for summary judgment for non-infringement and invalidity in the *HMR v. Andrx* case, HMR cannot, in good faith, assert that SR2 beads which release 'not less than 65% of the total diltiazem after 18 hours' literally infringe claim 1 of the '584 patent "or infringe claim 1 under the doctrine of equivalents." *Id.* at 2–3. Specifically, Andrx asserted that: (1) in a 1/23/97 Eli Shefter Decl. at ¶ 38, Shefter had opined that he would consider the range of variability of the 18 hour dissolution measurement for these beads to be closer to 20% than 10%; (2) in a 1/23/97 Decl. at ¶ 42, Shefter had opined that "results ranging from 63 to 70% are not within the range of variability attributable to measurement limitations of the dissolution test"; (3) in a 3/7/97 Eli Shefter Decl., he had opined that "the error at 18 hours should be about + or − 10% or measured values of about 35% to 55% drug released"; (4) therefore "the scope of claim 1

---

4. Andrx further explained that "[i]n addition to adding a small amount of a new ingredient to the SR2 bead coating, the Prior Approval Supplement submitted on September 11, 1998 requests permission to change the current 0.1 N HC1 dissolution specification for the SR2 bead from 'not less than 55% of the total diltiazem released after 18 hours' to 'not less than 65% of the total diltiazem released after 18 hours'. As clearly shown by the dissolution profiles attached hereto as Exhibit B, and more importantly the new 0.1 N HC1 dissolution specification of 'not less than 65% of the total diltiazem being released after 18 hours', neither the Andrx CARTIA XT product nor the individual SR1 beads and SR2 beads employed in the Andrx CARTIA XT product exhibit a dissolution profile that is within the three (3) specific dissolution ranges required by claims 1–9 of U.S. 5,470,584 and therefore cannot infringe any claim of U.S. 5,470,584." *Id.* at 11.

of the '584 patent is limited to a maximum amount of 55% of diltiazem released after 18 hours"; and (5) accordingly, "SR2 beads that will release not less than 65% of diltiazem after 18 hours are clearly outside the scope of claim 1 of the '584 patent as interpreted by HMR." *Id.* at 2. Andrx further contended that "[i]f HMR were to assert that claim 1 of the '584 patent includes SR2 beads that release not less than 65% of the total diltiazem after 18 hours under the doctrine of equivalents, that construction [would] require the claims of the '584 patent to include the prior art" and HMR's own expert "Dr. James W. McGinity has confirmed that United States Patent Nos. 5,002,776 and 4,894,240 disclose a delayed release diltiazem bead that releases 65% of the total diltiazem after 18 hours." *Id.* at 3.

On June 9, 1999, the FDA's approval of Andrx's prior approval supplement to its ANDA No. 74–752 became effective. *See* Bennett Decl. at ¶ 23. Also on June 9, 1999, over four months after Andrx filed its Second Supplemental Para. IV Patent Certification, Andrx and HMRI entered into a stipulation settling the HMRI/Andrx patent litigation, and terminated the HMRI/Andrx Agreement.

The stipulation settling the HMRI/Andrx patent infringement action provided that: (1) HMRI continues to assert that the formulation of the Andrx product identified in the complaint did and continues to infringe the '584 patent; and Andrx continues to assert that it does not or that such patent is invalid (Stip. at ¶ 5); (2) on September 11, 1998, Andrx filed a supplement to ANDA 74–752 with the FDA which provided a reformulation of the product that Andrx intends to sell; i.e., a modification in formulation and the dissolution specification for one of the intermediates for the product—diltiazem hydrochloride extended-release SR2 pellets; (3) on February 3, 1999, Andrx certified to HMRI that the reformulated product reflected in the supplement does not infringe HMRI's patents; (4) Andrx intends to market the reformulated product following FDA approval and, unless it obtains a

license from HMRI prior to that time, shall not market in the U.S. its earlier version of said product; (4) the reformulated product has SR2 pellets with average dissolution at 18 hours of not less than 68%; (5) HMRI stipulates that it will not prosecute a claim alleging patent infringement as to the reformulated product or seek to enjoin Andrx from marketing the reformulated product provided that the dissolution values are met or exceeded; (6) approval by the FDA of the reformulated product shall constitute final judgment under the September 24, 1997 HMRI/Andrx Agreement; and (7) any obligations arising under Paragraph 7(B) of the September 24, 1997 HMRI/Andrx Agreement (regarding license fees to be paid if Andrx had exercised its option and obtained a license from HMRI) shall be deemed fully satisfied without any further or other payments by either party to the other. *See* HMRI Appendix, Ex. 8, 6/9/99 Stipulation ("Settlement Agreement") in HMRI/Andrx patent case.

On June 23, 1999, Andrx began to commercially market Cartia XT and Andrx's 180–day period of exclusivity began to run. Since the time it has been marketed, Andrx's generic drug, Cartia XT, has been sold at a lower price than HMRI's Cardizem CD.

On June 24, 1999, the court entered an order dismissing the HMRI/Andrx patent infringement action.

By June 1999, when the HMRI/Andrx Agreement was terminated, HMRI had paid Andrx more than $89.83 million under the terms of that Agreement.

## C. Consolidated Suits Against Defendants

These cases involve claims that the Defendants violated section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and various state antitrust and unfair competition statutes. Plaintiffs allege the following contract, combination or conspiracy in restraint of trade: Defendant Andrx developed a generic drug which is the

bioequivalent to the Hoechst Defendants' prescription drug Cardizem CD. Andrx's generic drug was approved by the FDA for sale and could have entered the U.S. market on or about July 9, 1998. Andrx, however, did not enter the market at that time because it had agreed with its horizontal competitor, HMRI, that it would delay the entry of its generic version of Cardizem CD in exchange for, *inter alia*, non-refundable payments of $40 million per year from HMRI. Plaintiffs allege that this agreement is embodied in a September 24, 1997 document executed by Defendants HMRI and Andrx (the "HMRI/Andrx Agreement").

The HMRI/Andrx Agreement was executed nine days after the FDA preliminarily approved Defendant Andrx's generic drug as the first AB-rated generic bioequivalent for Cardizem CD. It is alleged that, under the terms of the Agreement, Defendant Andrx agreed not to market its generic drug when it received FDA approval, and agreed not to transfer, assign, or relinquish its right to a 180–day exclusivity period that Andrx would enjoy once it finally did begin to market its generic version of Cardizem CD, and Defendant HMRI agreed to pay Andrx $10 million quarterly, beginning on the date the Andrx product received FDA approval, and for as long as Andrx complied with the terms of the HMRI/Andrx Agreement. Thus, it is alleged that the HMRI/Andrx Agreement not only protected HMRI from competition from Andrx, but it also protected HMRI from competition from other generic competitors because Andrx's delayed entry would postpone the start of its 180–day exclusivity period, and Andrx's agreement not to give up or transfer its right to that 180–day period of exclusivity would preclude other generic competitors from entering the market until that 180–day exclusivity period expired.

### D. FTC Complaint Against Defendants

On March 16, 2000, the Federal Trade Commission filed a complaint against HMRI, Carderm Capital L.P., and Andrx Corp. alleging that (1) the HMRI/Andrx Agreement constitutes an unreasonable restraint of trade in violation of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45;[5] (2) HMRI had the specific intent to preserve its monopoly in the relevant market and narrower markets contained therein, and its actions— including proposing, negotiating and entering into the HMRI/Andrx Agreement and its proposal of a similar agreement with Biovail—created a dangerous probability that it would accomplish its monopolistic objectives, in violation of Section 5 of the FTC Act, as amended; (3) Defendants acted with the specific intent that HMRI monopolize the relevant market and engaged in overt acts described in the FTC complaint in furtherance of a conspiracy to monopolize the relevant markets, in violation of Section 5 of the FTC Act, as amended; and (4) the acts and practices described in the FTC complaint are anticompetitive in nature and tendency and constitute unfair methods of competition in violation of Section 5 of the FTC Act, as amended.

A hearing on the FTC complaint is set for November 14, 2000.

### II. Summary Judgment Standard

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

---

**5.** The Supreme Court has observed that "[t]he FTC Act's prohibition of unfair competition and deceptive acts or practices, 15 U.S.C. § 45(a)(1), overlaps the scope of § 1 of the Sherman Act, 15 U.S.C. § 1, aimed at prohib- iting restraint of trade". *California Dental Ass'n v. Federal Trade Comm'n,* 526 U.S. 756, 762 n. 3, 119 S.Ct. 1604, 1609 n. 3, 143 L.Ed.2d 935 (1999).

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Celotex,* 477 U.S. 317, 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### III. Analysis

The Sherman Act Class Plaintiffs and the Individual Sherman Act Plaintiffs argue that Defendants committed a *per se* violation of Section 1 of the Sherman Act when they entered into the September 24, 1997 HRMI/Andrx Agreement because it embodies an agreement to allocate the U.S. market for Cardizem CD and its bioequivalent AB-rated generics between HMRI and Andrx, who are horizontal competitors, and thus reduced competition, fixed the price of a widely prescribed heart medication, and unreasonably restrained trade. State Law Plaintiffs likewise assert that, because each of the jurisdictions implicated in their state law claims either follow federal Sherman Act precedent or find federal case law persuasive, the HMRI/Andrx Agreement of September 24, 1997 similarly constitutes a *per se* violation of the relevant state antitrust statutes.

The crux of Plaintiffs' argument is that well-established precedent and the undisputed facts show that: (1) agreements between actual or potential horizontal competitors to allocate markets are *per se* violations of the relevant antitrust laws; (2) the HMRI/Andrx Agreement is an agreement between actual or potential horizontal competitors to allocate markets, and thus the HMRI/Andrx Agreement constitutes a *per se* violation of the relevant antitrust laws; and (3) once a particular type of restraint has been placed in a *per se* category; i.e., horizontal market allocation agreement, it is conclusively presumed to be an unreasonable restraint of trade without an elaborate inquiry into purpose, power, or effects. *See, e.g., Topco,* 405 U.S. at 607, 92 S.Ct. 1126; *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 221–22, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

Defendants respond that the reasonableness of this alleged restraint of trade cannot be analyzed under the *per se* rule because the Agreement: (1) is not between actual or potential horizontal competitors; (2) does not allocate markets or fix prices and thus does not fall within the category of business practices analyzed under the *per se* rule; (3) is not a "naked" restraint of trade but rather was an agreement that was reasonably ancillary to pro-competitive activity; (4) is analogous to a patent settlement and thus should be analyzed under the rule of reason; and (5) is immunized from antitrust liability under the *Noerr–Pennington* doctrine. Defendant Andrx further responds that Plaintiffs' motions should be denied because determination of the issue presented will not materially simplify or expedite these cases. The Court addresses each of these arguments in turn, beginning with Andrx's argument that partial summary judgment on the issue presented is inappropriate.

### A. Propriety of Partial Summary Judgment

■ Defendant Andrx argues that Plaintiffs' motions for partial summary judgment are improper because resolution of the issue presented will not streamline the litigation process, materially shorten discovery or trial, or conserve judicial resources. This Court disagrees. Plaintiffs clarify that they seek only a ruling that the HMRI/Andrx Agreement is a naked horizontal market allocation agreement and is

thus a *per se* violation of the relevant antitrust laws, putting aside for the time being all issues of causation, injury and damages required for private recovery under section 4 of the Clayton Act, 15 U.S.C. § 15. Although Plaintiffs will still be required to prove causation, injury and damages, a decision that the Agreement is *per se* unreasonable will obviate the need for an "elaborate inquiry into the reasonableness of a challenged business practice" and the costs associated with such an inquiry. *See Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 343, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). Resolution of the issue presented here will greatly narrow the scope of discovery, will streamline the issues to be decided at trial, and will thus serve the interests of judicial economy. Other courts have similarly entertained motions for summary judgment on the issue whether a defendant's challenged activities were illegal *per se* under section 1 of the Sherman Act. *See Arizona v. Maricopa; Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); *New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F.Supp.2d 399 (S.D.N.Y. 2000).

## B. Per Se Analysis of the Challenged Restraint

The Court now considers whether the challenged restraint of trade is susceptible to analysis under the *per se* mode of analysis. The Court begins with a general description of the essential elements of Plaintiffs' Sherman Act and state law antitrust claims and the *per se* mode of analysis. It then clarifies that the question as to which mode of analysis is to be applied presents a question of law for the Court and that the critical inquiry, regardless of the mode of analysis, is whether the challenged restraint restricts rather than enhances competition.

### 1. General Principles

#### a. Violations of Section 1 of the Sherman Act

■ "The essential elements of a violation of Section 1 of the Sherman Act are: 1) a contract, combination or conspiracy; 2) affecting interstate commerce; 3) which imposes an 'unreasonable' restraint on trade." *White and White, Inc. v. American Hosp. Supply Corp.*, 723 F.2d 495, 504 (6th Cir.1983). The courts use two methods of analysis, the *per se* rule and the rule of reason, to determine "whether restraints of trade unreasonably restrict competition." *Cooperative Theatres*, 845 F.2d at 1370. "[T]he first employs a presumption that an agreement is an antitrust violation, thus invoking a per se illegality rule to classify the agreement; the second, called 'rule of reason' analysis, requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint of trade." *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1088 (6th Cir. 1996) (internal quotes and citations omitted).

#### b. State Law Antitrust Claims

■ It is not disputed that the state antitrust statutes at issue here either follow federal Sherman Act precedent or find federal case law persuasive. Accordingly, a decision that the HMRI/Andrx Agreement is illegal *per se* under § 1 of the Sherman Act will likewise result in a similar decision under the relevant California, District of Columbia, Michigan, Minnesota, New York, North Carolina, Tennessee and Wisconsin antitrust statutes.[6]

---

**6.** *See Marin County Bd. of Realtors, Inc. v. Palsson*, 16 Cal.3d 920, 925, 130 Cal.Rptr. 1, 549 P.2d 833 (1976), *Truta v. Avis Rent A Car System, Inc.*, 193 Cal.App.3d 802, 822, 238 Cal.Rptr. 806 (1987) (observing that California's Cartwright Act "is patterned after the federal Sherman Anti-trust Act and decisions under the latter are applicable as an aid to a decision in interpreting the former"); D.C.Code Ann. § 28–4502 (D.C.'s counterpart to § 1 of the Sherman Act) and § 28–4515 (1998) (expressly stating the intent that the courts are to use federal precedent interpreting federal antitrust laws as a guide to interpretation of D.C.'s antitrust laws); Mich. Comp.Laws § 445.784 (1999) (expressly directing the courts to give "due deference to interpretations given by the federal courts to

### c. Per Se Analysis

The Supreme Court has observed that "[c]ertain agreements, such as horizontal price fixing and market allocation, are thought so inherently anti-competitive that each is illegal *per se* without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). *See also Arizona v. Maricopa County Medical Soc.*, 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (horizontal price-fixing arrangement); *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curium) (horizontal market allocation agreement); *Topco*, 405 U.S. at 608, 92 S.Ct. 1126 (observing that "[o]ne of the classic examples of a violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition"); *Cooperative Theatres*, 845 F.2d 1367 (6th Cir.1988) (horizontal agreements to allocate markets among competitors); *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir.1995) (same). Accordingly, "[i]n those horizontal price-fixing [and market allocation] cases where the *per se* rule applies, the only inquiry is whether there was an agreement to restrain trade, since the unreasonableness of the restraint is conclusively presumed regardless of whether the rule of reason would lead to a different result." *Re/Max Int'l v. Realty One, Inc.*, 900 F.Supp. 132, 148 n. 8 (N.D.Ohio, 1995) (citing *Maricopa County Medical Soc'y*, 457 U.S. at 344, 102 S.Ct. 2466), *aff'd*, 173 F.3d 995 (6th Cir.1999), *petition for cert. filed*, 68 U.S.L.W. 3138 (Aug. 17, 1999) (No. 99–294).

■ As Professor Hovenkamp explains, "[c]ourts often say that a 'naked' horizontal restraint is illegal 'per se.' What this label means in practice is that (a) neither a relevant market nor an estimate of the defendants' market power must be established to prove that the restraint is unlawful; (b) harmful effects are presumed; and (c) the range of permissible defenses is severely limited." 11 H. Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application*, ¶ 1910a at 252 (1998 ed.) (footnotes omitted). "[T]he justification for the per se rule rests on an implicit and rather loose 'cost-benefit' analysis concluding that for certain classes of restraints the added costs of applying a rule of reason are not justified

comparable antitrust statutes, including, without limitation, the doctrine of *per se* violations" in construing the Michigan Antitrust Reform Act); *State by Humphrey v. Alpine Air Prod., Inc.*, 490 N.W.2d 888, 894 (Minn.App. 1992) (observing that the "Minnesota court's have consistently held that Minnesota antitrust law is to be interpreted consistently with the federal courts' construction of federal antitrust law"), *aff'd*, 500 N.W.2d 788 (1993); *People v. Rattenni*, 179 A.D.2d 691, 692, 578 N.Y.S.2d 257 (N.Y.App.Div.1992) (observing that "[a]lthough we do not move in lockstep with the Federal courts in our interpretation of antitrust law ... the Donnelly Act ... should generally be construed in light of Federal precedent" and further observing that "[i]t is well established that the horizontal customer allocation agreement would constitute a *per se* violation of the Sherman Act, the federal antitrust statute, and there is no reason for a different conclusion under the New York Statute"), *aff'd*, 81 N.Y.2d 166, 597 N.Y.S.2d 280, 613 N.E.2d 155 (1993); *DKH Corp. v. Rankin–Patterson Oil Co., Inc.*, 131 N.C.App. 126, 506 S.E.2d

256, 258 (N.C.App.1998) (observing that the North Carolina courts will look to federal antitrust decisions for guidance in determining the scope and meaning of North Carolina's antitrust statute); *State ex rel. Leech v. Levi Strauss*, 1980 WL 4696 at *2 n. 2 (Tenn. Ch.1980) (observing that "[a]uthorities which define the character of private damage suits under the federal anti-trust statutes, particularly the Sherman Act, are most persuasive"); Tenn.Code Ann. §§ 47–25–101 (1999) (providing that any "arrangements, contracts, [and] agreements ... which tend to lessen ... full and free competition" are unlawful); *State v. Waste Management of Wis., Inc.*, 81 Wis.2d 555, 261 N.W.2d 147, 155 (1978) (observing that conspiracies in restraint of trade under the Sherman Act are likewise conspiracies in restraint of trade under the Wisconsin antitrust act); *Indep. Milk Producers Co–op v. Stoffel*, 102 Wis.2d 1, 298 N.W.2d 102, 104–05 (Wis.App.1980) (observing that "[c]onduct labelled as *per se* illegal includes price fixing, group boycotts, horizontal market allocation, resale price maintenance, and tying arrangements").

by the resulting improvement in accuracy of outcome." *Id.* The rule "is based on the premise that particular restraints are unreasonable *as a class.* As a result, once the tribunal concludes that the restraint at issue is within the class, further inquiry into the merits of that particular restraint is unwarranted." *Id.* at ¶ 1910b, p. 252 (emphasis in original).

■ The Sixth Circuit has similarly observed, "a court's choice between a per se rule and 'rule of reason' analysis is driven largely by analogy. A court should find a per se antitrust violation only when prior cases have established the anti-competitive effects of a sufficiently similar business practice." *Betkerur,* 78 F.3d at 1089. Business practices condemned under the *per se* rule include horizontal agreements to allocate markets and to fix prices. *See Copperweld Corp.,* 467 U.S. at 768, 104 S.Ct. 2731. The Sixth Circuit has further observed that, " 'horizontal' restraints— that is, agreements among competitors at the same level of the market structure— are particularly suspect because they typically serve no purpose other than to stifle competition." *Betkerur,* 78 F.3d at 1092.

### d. Question of Law for the Court

■ The question presented here; i.e., whether to apply a *per se* or rule of reason mode of analysis in determining the reasonableness of the challenged restraint of trade, is a question of law for the Court. *See In re American Honda Motor Co., Inc. Dealerships Relations Litig.,* 941 F.Supp. 528, 562 (D.Md.1996). "While applying any one of antitrust's modes of analysis might involve many fact questions, the selection of a mode is entirely a question of law." 11 H. Hovenkamp, *supra,* ¶ 1909b at 251 (citing *Maricopa County Medical Society,* 457 U.S. at 337 n. 3, 102 S.Ct. 2466). As Professor Hovenkamp observes, "the entire premise of the per se rule is that *judicial* experience with a certain class of restraints justifies more expedited treatment." Hovenkamp, *supra* ¶ 1909b at 251 (citing *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,* 468 U.S. 85, 100–101, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)). Accord-

ingly, the testimony of Defendant HMRI's expert, Dr. Roger Blair, opining that the HMRI/Andrx Agreement should be analyzed under the rule of reason rather than the *per se* rule, inappropriately renders an opinion on a question of law that rests solely within the province of the Court and thus is not considered here.

### e. Critical Inquiry—Does the Challenged Restraint Enhance Competition

■ Despite the identification of different modes of analysis for determining the reasonableness of a challenged restraint of trade, the Supreme Court has observed that the ultimate goal is to answer the critical question whether the challenged restraint enhances or impairs competition. Regardless of whether the "unreasonableness" finding " 'is the product of a presumption [under a *per se* analysis] or actual market analysis [under a rule of reason analysis], the essential inquiry remains the same—whether or not the challenged restraint enhances competition.' " *California Dental Ass'n v. Federal Trade Comm'n,* 526 U.S. 756, 779, 119 S.Ct. 1604, 1617, 143 L.Ed.2d 935 (1999) (quoting *Nat'l Collegiate,* 468 U.S. at 104, 104 S.Ct. 2948). Thus, "[e]very antitrust suit should begin by identifying the ways in which a challenged restraint might possibly impair competition." 7 P. Areeda, *Antitrust Law* ¶ 1503a at 372 (1986 ed.). This applies to *per se* cases as well. "Although a per se rule is seemingly satisfied merely by showing, say, 'price fixing,' specifying the competitive evil helps reassure us that the challenged conduct actually falls in that category." *Id.* at 372, n. 1. "Identifying the type of possible harm to competition is the first essential step." 7 P. Areeda, *supra,* ¶ 1503 at 374.

Accordingly, this Court will first construe the terms of HMRI/Andrx Agreement and identify whether the challenged restraints in that Agreement might, on their face, impair or enhance competition. The Court will then address Defendants'

arguments that the HMRI/Andrx Agreement is: (1) not between actual or potential horizontal competitors; (2) not a market allocation or price fixing agreement; (3) not a "naked" restraint of trade but rather is an agreement reasonably ancillary to a pro-competitive activity; (4) analogous to a patent settlement agreement and thus should be analyzed under the rule of reason mode of analysis; and (5) immunized from antitrust liability under the *Noerr–Pennington* doctrine.

### 2. Construction of the HMRI/Andrx Agreement—Identifying Whether the Challenged Restraints Enhance or Inhibit Competition

#### a. General Principles

■ The HMRI/Andrx Agreement is to be interpreted in accordance with the general principles of contract law, and, as provided in ¶ 11 of that Agreement, "all the terms and provisions" "shall be construed under the laws of the State of Florida." Under Florida law, "the interpretation of a written contract is a matter of law to be determined by the court." *DEC Elec., Inc. v. Raphael Constr. Corp.*, 558 So.2d 427, 428 (Fla.1990). Accordingly, this Court does not consider the testimony of Defendant HMRI's experts, A. Bennett and R. Blair, or that of Defendant Andrx's Vice President/General Counsel, Scott Lodin, that construe the terms of the HMRI/Andrx Agreement or proffer testimony that is contrary to this Court's construction of the Agreement. *See* A. Bennett Decl. at ¶¶ 11, 12; R. Blair Decl. at ¶¶ 5, 8, 17; and S. Lodin Decl. at ¶¶ 8, 15, 17–20, 22–23, 25.

■ "Contract interpretation principles under Florida law require [the Court] to look first at the words used on the face of the contract to determine whether that contract is ambiguous. It is well settled that the actual language used in the contract is the best evidence of the intent of the parties and, thus, the plain meaning of that language controls." *Rose v. M/V "Gulf Stream Falcon"*, 186 F.3d 1345, 1350 (11th Cir.1999) (citations omitted). Furthermore, "under Florida law, ... 'whereas' or other prefatory clauses are not binding" and "although, the 'whereas' clause may be evidence of parties' intent, [the Court] need not even look to the 'whereas' clause if the operative portion of the contract is unambiguous." *Id.* at 1350.

#### b. The HMRI/Andrx Agreement

■ To give the Court's construction of the HMRI/Andrx Agreement some context, the Court sets forth the following undisputed facts. On September 15, 1997, the FDA issued tentative approval of Andrx's ANDA, which was an indication that the ANDA would be approved as soon as it was legally eligible; i.e., on or about July 8, 1998, the date the 30–month Hatch–Waxman waiting period was due to expire. Less than ten days after the FDA's tentative approval, the Defendants entered into the HMRI/Andrx Agreement. The Agreement was entered into while the patent infringement action between HMRI and Andrx was pending. The Agreement, however, was not presented to, filed in, or approved by the court presiding over that patent infringement action.

On September 11, 1998, Andrx filed a prior approval supplement to its ANDA No. 74–752 seeking permission to add a small amount of a new ingredient to the SR2 bead coating and to change the dissolution specification for the SR2 bead from not less than 55% of total diltiazem being released after 18 hours to not less than 65% being released after 18 hours. On June 9, 1999, the FDA's approval of Andrx's prior approval supplement to its ANDA No. 74–752 became effective. Also on June 9, 1999, HMRI and Andrx filed a stipulation agreeing to settle the HMRI/Andrx patent case. Andrx did not commence marketing or selling its generic version of Cardizem CD until June 23, 1999, after the HMRI/Andrx Agreement was terminated and the HMRI/Andrx patent case was settled.

The Court now construes the terms of the HMRI/Andrx Agreement. The Agree-

ment acknowledged that Andrx had formulated a bioequivalent or generic version of Cardizem CD and had filed an ANDA with the FDA seeking the right to sell the generic drug identified in its ANDA. The Agreement identified Andrx's generic version of Cardizem CD as "the Andrx Product" and defined it as "the product Andrx intends to sell pursuant to the ANDA on file with the FDA *and as said ANDA may be amended consistent with this subparagraph.*" Agreement at ¶ 8(B)(iv) (emphasis added). Thus, the Andrx Product which was the subject of the HMRI/Andrx Agreement was that described in Andrx's ANDA No. 74–752 and that described in any amendment or modification to Andrx's ANDA No. 74–752 not requiring withdrawal of that ANDA or submission of a new ANDA. *Id.*

The Agreement also acknowledged that: (1) the Andrx Product was the subject of a pending patent infringement action brought by HMRI against Andrx; (2) HMRI had asserted its intent to seek an injunction barring Andrx from marketing, distributing or selling the Andrx Product prior to entry of a final and unappealable order or judgment in the HMRI/Andrx patent infringement case; (3) Andrx was aware of the financial risks it faced if HMRI sought and obtained injunctive relief or ultimately prevailed in its patent infringement action, as well as the risk of losing substantial revenues from the Andrx Product if it were to refrain from selling the Andrx Product until after a final and unappealable order or judgment was issued in its favor in the HMRI/Andrx patent case; and (4) although HMRI and Andrx intended to fully and vigorously litigate the infringement and validity issues in the pending HMRI/Andrx patent case, they also wished to reduce the risk of loss inherent in that litigation. *See* HMRI/Andrx Agreement at 1–2 ("Whereas" clauses).

Under the unambiguous terms of the HMRI/Andrx Agreement, Andrx agreed that it would not "commence the commercial sale" of its generic version of Cardizem CD (which was the subject of its pending ANDA) *"or other bioequivalent or generic version of Cardizem CD"* in the United States either directly or indirectly until the earlier of: (1) entry of a final and unappealable order or judgment in the pending HMRI/Andrx patent infringement case; (2) Andrx obtained a license from HMRI after exercising its option under the terms of the HMRI/Andrx Agreement;[7] or (3) HMRI provided notice of the date that either HMRI or a third party licensee was authorized to make its first commercial sale of a bioequivalent or generic version of Cardizem CD. *See* HMRI/Andrx Agreement at ¶ 2(A) (emphasis added).

Andrx further agreed that, while the HMRI/Andrx patent infringement case was pending, it would "diligently prosecute" its ANDA and would "not relinquish or otherwise compromise any right accruing thereunder or pertaining thereto." *Id.* Andrx was allowed to modify or amend its ANDA as long as that did not require it to withdraw its existing ANDA. ¶ 8(B)(iv). The clear intent here was to protect the 180–day period of exclusivity awarded to Andrx under the Hatch–Waxman Amendments as the first-filed ANDA with a Paragraph IV certification.

Andrx also agreed to dismiss, without prejudice, its antitrust and unfair competition counterclaims filed against HMRI in the HMRI/Andrx patent case. As between HMRI and Andrx, the dismissal was deemed to be with prejudice on the effective date of a final and unappealable order or judgment in the HMRI/Andrx patent case "provided that HMRI ha[d] fully complied with the terms" of the Agreement. *See* HMRI/Andrx Agreement at ¶ 2(C).

7. The Agreement provided three opportunities for Andrx to exercise its option to obtain a license, including an opportunity to exercise its option and obtain a license while the

HMRI/Andrx suit remained pending; i.e., in January 2000 (18 months after FDA approval of the Andrx Product). *See* HMRI/Andrx Agreement ¶ 6(A)(ii).

Accordingly, on its face, the HMRI/ Andrx Agreement: (1) restrained Andrx from marketing its generic version of Cardizem CD in July 1998 when FDA approval was expected and obtained; (2) restrained Andrx from marketing other bioequivalent or generic versions of Cardizem CD which were not at issue in the pending HMRI/Andrx patent case, including the reformulated generic drug described in its September 11, 1998 prior approval supplement to Andrx's ANDA No. 74–752; and (3) restrained Andrx from relinquishing or otherwise compromising its right to the 180–day period of exclusivity it obtained under the Hatch– Waxman Amendments.

HMRI agreed, under the unambiguous terms of the HMRI/Andrx Agreement, that it would not seek preliminary injunctive relief against Andrx, that it would provide Andrx with copies of changes it proposed to the FDA regarding its Cardizem CD package insert and immediate container label, and that it would notify Andrx of any labeling change approved by the FDA regarding Cardizem CD. *See* HMRI/ Andrx Agreement at ¶¶ 2(A), 2(B).

HMRI also agreed that it would make interim payments to Andrx in the amount of $40 million per year, payable quarterly, and beginning on the date Andrx's generic version of Cardizem CD received FDA approval (July 8, 1998). *Id.* at ¶ (4)(A). These interim payments were to end on: (1) the date of a final and unappealable order or judgment in the HMRI/Andrx patent case;[8] (2) in the event HMRI notified Andrx that it intended to license its intellectual property for the purpose of selling a generic version of Cardizem CD to a third party or intended to use this property itself for the same purpose, then the interim payments were to end on the earlier of: a) the expiration date of the required notice period, or b) the date Andrx effected its first commercial sale of the Andrx Product; or (3) in the event Andrx exercised its option to acquire a license from HMRI, then interim payments were to end on the date the license agreement became effective. *See* HMRI/ Andrx Agreement at ¶¶ 4(A)–(C).

The Agreement, despite calling the interim quarterly payments "nonrefundable," required repayment if, prior to the effective date of a final and unappealable order or judgment in the HMRI/Andrx patent case: (1) Andrx commenced the commercial sale of the Andrx Product in the United States, directly or indirectly (¶ 8(B)(i)); (2) Andrx commenced the commercial sale of other bioequivalent or generic versions of Cardizem CD in the United States, directly or indirectly (¶ 8(B)(i)); (3) Andrx failed to diligently prosecute or withdrew its ANDA for the Andrx Product or relinquished or otherwise compromised any right accruing under its ANDA (¶ 8(B)(i)); (4) Andrx transferred, sold, or assigned, without HMRI's express written consent, any option or licensing rights issued pursuant to the HMRI/Andrx Agreement (¶ 8(B)(i)); or (5) Andrx stipulated in writing or in open court and on the record that the '584 patent was valid and that the Andrx Product infringed the '584 patent before there was a court determination on those issues (¶ 8(D)). Each of these events, also terminated the Agreement. *See* HMRI/Andrx Agreement at ¶¶ 8(B)(i), 8(D).

**8.** The HMRI/Andrx Agreement provided that, in the event there was a final unappealable determination in the HMRI/Andrx patent case that did not determine the validity, enforceability or infringement of the '584 patent and HMRI notified Andrx in writing within 30 days that it continued to believe that the Andrx Product infringed the '584 patent and that it would refile its action and did so within the time frame set forth in ¶ 8(C), then this renewed action would continue the obligations and rights set forth in the Agreement as if no final, unappealable determination had been entered. *See* HMRI/Andrx Agreement at ¶ 8(C). Accordingly, these interim payments and Andrx's agreement not to begin commercial marketing of the Andrx Product or to compromise its right to the 180–day period of exclusivity could continue beyond the time a final and unappealable judgment or order took effect in the HMRI/Andrx patent case.

HMRI also agreed to pay Andrx $100 million per year,[9] less the amount of interim payments previously paid to Andrx under the terms of the Agreement, if: (1) Andrx obtained a final and unappealable order or judgment in the HMRI/Andrx patent case determining that the '584 patent was invalid or unenforceable or that the Andrx Product did not infringe the '584 patent, (¶ 3(B)); (2) HMRI dismissed the HMRI/Andrx patent infringement case prior to the effective date of a final and unappealable order in the HMRI/Andrx patent case (¶ 8(A)); or (3) there was a final and unappealable determination in the HMRI/Andrx patent case that did not determine the issues of the '584 patent's validity, enforcement or infringement and HMRI failed to notify Andrx, within 30 days of that determination, that it continued to believe that the Andrx Product infringed the '584 patent and that it would refile, and did refile, its patent infringement action (¶ 8(C)).

HMRI further agreed to grant Andrx an irrevocable option to acquire a non-exclusive license to all intellectual property HMRI owned or controlled that Andrx may need to market its generic version of Cardizem CD in the United States. *See* HMRI/Andrx Agreement at ¶ 5. Andrx was prohibited from transferring, selling, or assigning, without HMRI's express written consent, its option to acquire a license from HMRI or any rights granted to Andrx if it did exercise that option and acquired a license. *Id.* at ¶ 8(B). Andrx had only three opportunities to exercise the option to acquire a license: (1) within 30 days from the effective date of a final and unappealable order or judgment in the HMRI/Andrx patent case (¶ 6(A)(i)); (2) in the event a final and unappealable order or judgment had not been entered, then beginning at the earlier of: a) 18 months after FDA approval (January 2000), or b) the effective date of FDA approval for a third party to make and market a bioequivalent or generic version of Cardizem CD

(which, under the terms of the Hatch–Waxman Amendments, could not occur until 180 days after Andrx either· began commercial marketing of its generic version of Cardizem CD or there was a court decision that the '584 patent was invalid or not infringed by Andrx's generic drug), and ending 30 days after the effective date of a final and unappealable order or judgment in the HMRI/Andrx patent case (¶ 6(A)(ii)); or (3) in the event that HMRI notified Andrx that HMRI or another third party would be using HMRI's intellectual property for the purpose of selling a generic version of Cardizem CD, Andrx could exercise its option at any time beginning on the date it received notice from HMRI and ending on the effective date of a final and unappealable order or judgment in the HMRI/Andrx patent case (¶ 6(A)(iii)).

In the event Andrx decided to exercise its option to acquire a license, the Agreement also provided for license fees and royalty payments. *See* HMRI/Andrx Agreement at ¶ 7. HMRI was required to refund the license fees and royalty payments if: (1) a final and unappealable order or judgment in the HMRI/Andrx patent case determined that the '584 patent was invalid or unenforceable or was not infringed (¶ 7(B)(i)); or (2) HMRI dismissed the HMRI/Andrx patent infringement action prior to the effective date of a final and unappealable order or judgment (¶ 8(A)).

Both parties agreed that: (1) they would not ask the court presiding over the HMRI/Andrx patent case for an order increasing or decreasing the Hatch–Waxman 30–month 'waiting period (¶ 2(D)); (2) "[e]xcept as otherwise required by law or as otherwise may be requested by the court" in the HMRI/Andrx patent case, the terms and existence of the Agreement would be kept confidential (¶ 9); and (3) the Agreement "and any drafts thereof or

---

9. HMRI and Andrx stipulated that, for the purposes of this Agreement, "the profits that Andrx would have realized from the sale of the Andrx Product would be $100 million per year after FDA approval." HMRI/Andrx Agreement at ¶ 3(A).

any documents or records pertaining thereto or information derived therefrom" would not be introduced into evidence in the HMRI/Andrx patent case "or any other litigation for any purpose." HMRI/Andrx Agreement at ¶ 9.

### c. Restraints of Trade and Likely Effects on Competition

On its face, the Agreement: (1) restrained Andrx from marketing its generic version of Cardizem CD in July 1998 when FDA approval was expected and obtained; (2) restrained Andrx from marketing other bioequivalent or generic versions of Cardizem CD which were not at issue in the pending HMRI/Andrx patent case, including the reformulated generic drug described in its September 11, 1998 prior approval supplement to its ANDA No. 74–752, and thus restrained Andrx from marketing non-infringing or potentially non-infringing versions of Cardizem CD; and (3) restrained Andrx from relinquishing or otherwise compromising its right to the 180–day period of exclusivity it obtained under the Hatch–Waxman Amendments. The HMRI/Andrx Agreement thus inhibited rather than enhanced generic competition for Cardizem CD and allocated the entire United States market for Cardizem CD and its bioequivalents to HMRI during the life of that Agreement. By restricting generic competition, the Agreement also allowed HMRI to maintain or fix the price of Cardizem CD at non-competitive price levels.

The Agreement's terms as to the $10 million quarterly payments to Andrx, beginning in July 1998 when Andrx obtained FDA approval of its generic version of Cardizem CD, further restrained generic competition. First, they provided Andrx with an incentive to stay off the market beyond the time when it could have commenced marketing its generic drug (July 1998). They further restrained generic competition by providing Andrx with an incentive not to relinquish its right to the 180–day exclusivity period for marketing that it had obtained under the Hatch–Waxman Amendments from its status as the first generic manufacturer to file an ANDA with a Paragraph IV certification. Other generic drug manufacturers filing second and subsequent ANDAs for generic versions of Cardizem CD were required to wait until Andrx's 180–day exclusivity period expired before they could obtain FDA approval and enter the market. *See Mylan Pharm,* 81 F.Supp.2d at 33.

This Court concludes that the September 24, 1997 HMRI/Andrx Agreement is unlawful on its face and is a *per se* violation of Section 1 of the Sherman Act. Contrary to Defendants' arguments, the HMRI/Andrx Agreement is an agreement between horizontal competitors to minimize generic competition and to allocate the entire United States market for Cardizem CD to HMRI during the life of the Agreement. *See Topco,* 405 U.S. at 608, 92 S.Ct. 1126 (observing that "[o]ne of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition"). *See also Palmer,* 111 S.Ct. at 403 (observing that previous competition in the market is not required, that the "defendants in *Topco* had never competed in the same market, but had simply agreed to allocate markets", and further observing that horizontal market allocation agreements "are anti-competitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other"); *Cooperative Theatres,* 845 F.2d at 1372 (observing that "a horizontal agreement to allocate customers between competing companies is a *per se* violation of Section 1 of the Sherman Act"); *Blackburn v. Sweeney,* 53 F.3d at 827 (observing that "[h]orizontal agreements to allocate markets among competitors are *per se* violations of the Sherman Act"). The Court is not persuaded by Defendants' argument that the HMRI/Andrx Agreement is an agreement that was reasonably ancillary to pro-competitive activity rather than a "naked" restraint of trade.

### d. Defendants' Arguments Against Per Se Treatment

### 1. The HMRI/Andrx Agreement is a Horizontal Agreement

■ Defendants do not dispute that they perform at the same level of the market structure or that they are currently competitors in the U.S. market for Cardizem CD or its bioequivalents. Nonetheless, Defendants argue here, as they did in their motions to dismiss, that they cannot be considered horizontal competitors because they were neither competitors nor potential competitors during the life of their Agreement. Specifically, Defendants argue that, during that time, they were never in direct competition and, furthermore, cannot be considered potential competitors because, until HMRI's patent claims were resolved, Andrx had no right to compete.[10] Defendants' arguments are without merit. First, it is not necessary that Defendants be actual competitors at the time of their Agreement. *See Palmer,* 111 S.Ct. at 403, (observing that, to prove a *per se* violation, a plaintiff need not show that the defendants had previously competed in the relevant market). Furthermore, Defendants' potential competitor arguments are built on the erroneous

presumptions that Andrx's generic drug would infringe the '584 patent and that potential rivalry means the ability to compete free from the risk of patent liability.[11] *See* Order No. 12, Mem.Op. & Order at 117–122.

"An arrangement is said to be 'horizontal' when (1) its participants are *either* (a) actual rivals at the time the agreement is made or (b) potential rivals at the time the agreement is made; *and* (2) the agreement eliminates some avenue of rivalry among participants." 11 H. Hovenkamp, *supra,* ¶ 1901b at 185. Despite arguments to the contrary, HMRI and Andrx were potential rivals at the time the HMRI/Andrx Agreement was made, and the Agreement eliminated an avenue of rivalry; i.e., Andrx's entry in the market with a generic version of Cardizem CD. Testimony by Andrx's Vice President/General Counsel, Scott Lodin, that, at the time the Agreement was made, Andrx did not consider itself to be a competitor or potential competitor of HMRI is to no avail. *See* S. Lodin Aff'd at ¶ 15. Mr. Lodin's testimony is contrary to this Court's construction of the HMRI/Andrx Agreement; i.e., the plain language of that Agreement reflects that Andrx was considered a potential rival of HMRI in the U.S. market for Cardizem CD and its bioequivalents.[12]

10. In support of this position, Defendant HMRI proffers the testimony of its expert, G. Methvin, opining that it was more likely than not that HMRI would have prevailed on its patent infringement claims, that the Court would have adopted the claim construction urged by Defendant HMRI, and that HMRI would have been entitled to a preliminary injunction in the HMRI/Andrx patent infringement case. The Court does not consider this testimony because it inappropriately renders an opinion on questions of law that rest solely within the province of the Court; i.e., claim construction and the grant or denial of injunctive relief.

11. Defendants refer to this as competing "without the threat of economic ruin." *See* Andrx Br. at 27.

12. Mr. Lodin's testimony is also belied by: (1) his earlier testimony that Andrx's "primary goal was to begin selling our product as soon as we could prudently do so, in order to provide consumers with a genuine alternative to HMR's brand name drug and to demon-

strate that Andrx was a serious participant in the generic pharmaceutical industry", *Id.* at ¶ 5; and (2) contemporaneous public statements in 1997 and 1998 by both HMRI and Andrx showing that they had no trouble recognizing that they were one another's competitors in the relevant market. *See* Jt. App., Tab 2 at 37, 'October 1997 Andrx Amendment No. 1 to S–1 filing (where, in SEC filings, Andrx represented to its shareholders that it had submitted ANDAs to the FDA covering, *inter alia,* bioequivalent versions of "Cardizem CD which is marketed by HMR.... In September 1997 [Andrx] received tentative FDA approval of its ANDA for the bioequivalent version of Cardizem/registered trademark/ CD). As a result of the HMR Litigation, the FDA may not grant final approval of [Andrx]'s ANDA for Cardizem/registered trademark/CD until after either the HMR Litigation is resolved in Andrx's favor or July 3, 1998 (30 months after HMRI received Andrx's certification that its product does not infringe the patents listed for "Cardizem/registered trademark /CD"). *See also*

## 2. The HMRI/Andrx Agreement Allocates the U.S. Market for Cardizem CD

 Andrx sought to compete with HMRI in the sale of Cardizem CD and its bioequivalents. This is evident from its ANDA No. 74–752, its Paragraph IV certification, and the subsequent HMRI/Andrx patent litigation. Within ten days of the FDA's tentative approval of Andrx's generic version of Cardizem CD, Defendants entered into the HMRI/Andrx Agreement. The unambiguous terms of the HMRI/Andrx Agreement allocate the entire U.S. market for Cardizem CD and its bioequivalents to HMRI while compensating Andrx, its potential competitor, $10 million dollars a quarter for not marketing its generic version of Cardizem CD and for not relinquishing or compromising its right to the 180–day period of marketing exclusivity it obtained under the Hatch–Waxman Amendments. This Agreement is a straight forward horizontal market allocation agreement and thus fits within the category of business practices which have long been held illegal *per se* under section 1 of the Sherman Act. *See Topco; Palmer; Cooperative Theatres,* 845 F.2d at 1372; *Blackburn v. Sweeney,* 53 F.3d at 827.

> Jt.App., Tab 5 at 9, 1998 Hoechst AG 20–F filing (where HMRI also specifically warned its shareholders that generic competition for its products in general would "erode market share and sales revenues" and, in particular, generic sales of Cardizem CD "would have a material adverse effect on the operating profit of the Group" and further observed that "[a]lthough Cardizem CD ... is protected by formulation patents that prevent competition by others using the same formulation, a number of companies have filed for approval by the United States Food and Drug Administration ("FDA") of generically substitutable once-daily diltiazem formulations (at least one of which has been approved for marketing), which they assert do not infringe these patents. Should any of these products be marketed and not infringe HMR's patents, it likely would have a material adverse effect on Cardizem CD sales and could have a material adverse effect on the operating profit of the Group. Marketing of such a product could occur as early as 1999'').

Defendants' causation arguments do not require a contrary conclusion. Whether Andrx's prior unilateral decision, as opposed to the HMRI/Andrx Agreement, caused it to stay off the market after it had obtained FDA approval and the 30–month Hatch–Waxman waiting period had expired is not at issue here.[13] The anti-competitive effects of HMRI's patent are likewise not at issue. Rather than Andrx's unilateral decisions, the conduct at issue here is Andrx's bilateral agreement with HMRI, its horizontal competitor, that unambiguously allocates the entire market for Cardizem CD and its bioequivalents to HMRI for as long as the Agreement remained in effect. As the Supreme Court observed in *Socony–Vacuum Oil,* 310 U.S. at 224, n. 9, 60 S.Ct. 811, it is well settled that "conspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring. (citation omitted). It is the 'contract, combination ... or conspiracy, in restraint of trade or commerce' which § 1 of the Act strikes down, whether the concerted activity be wholly nascent or abortive on the one hand, or successful on the other."

13. *See* S. Lodin Decl. at ¶¶ 8, 14–16, 19, 22 (where Andrx's Vice President/General Counsel testifies that, prior to the time Andrx entered into the HMRI/Andrx Agreement, Andrx had already decided that it would not enter the market until the HMRI/Andrx patent suit was resolved and had already decided that it would not abandon its pending ANDA). The Supreme Court, apparently ignoring a similar defense, held a horizontal market allocation agreement *per se* illegal under § 1 of the Sherman Act. In *Palmer,* the defendant who agreed to withdraw from the Georgia market submitted an affidavit in the district court similarly averring that it had unilaterally decided to withdraw from the Georgia market before it entered into the challenged agreement. *See Palmer v. BRG of Georgia, Inc.,* 874 F.2d 1417, 1418 (11th Cir.1989), *rev'd,* 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990). Without regard to the defendant's affidavit as to its unilateral decision, the Supreme Court examined the challenged agreement on its face and held that the horizontal market allocation agreement in *Palmer* was illegal *per se. See Palmer,* 111 S.Ct. at 403.

As Professor Hovenkamp has observed, "[h]orizontal agreements are antitrust's most 'suspect' classification" and *"as a class* deserve stricter scrutiny than" unilateral acts or vertical agreements because "they pose the most significant dangers of competitive harm." 11 H. Hovenkamp, *supra,* ¶ 1902a at 190–91 (emphasis in original). "The main threat of horizontal agreements is that they can enable participants to reduce the output of goods in some market, thus causing higher prices, inefficient substitutions, and the resultant losses to consumer welfare." *Id.* at 191. Unilateral acts, on the other hand, "always pose a lower threat than horizontal combinations. By definition, a unilateral act does not limit the activities of actual or potential rivals." *Id.,* ¶ 1902b at 193.

The decisions Defendants rely upon do not support a contrary result. In *United States v. Westinghouse Elec. Corp.,* 648 F.2d 642, 648–49 (9th Cir.1981), Westinghouse had entered into technical assistance agreements with some companies granting them licenses to manufacture, use, and sell certain electrical products under Westinghouse's foreign patents. No licenses were granted under Westinghouse's U.S. or Canadian patents. Nothing in the agreements, however, forbid the licensees from manufacturing, using, or selling the products covered by the foreign licenses in the United States or Canada. *Id.* at 645.

At the bench trial, the Government argued, *inter alia,* that they had established the necessary causal link for their antitrust case against Westinghouse by presenting evidence showing that the licensees had sought Westinghouse's approval before they attempted to sell the products listed in the technical assistance agreements in the United States. The district court disagreed, finding that the Government had not met its burden of proof *on the issue of causation* because the licensees had argued that "they did not act on the basis of an illegal agreement with Westinghouse but rather out of fear of infringing Westinghouse's patents." *Id.* at 648–49 (internal quotes and citations omitted). The Ninth Circuit affirmed the district court's dismissal based on the Government's failure to meet its burden on the issue of causation observing that:

> If fear of patent infringement was the reason [the licensee] sought Westinghouse approval before selling products covered by the Agreements in the United States, then it cannot be said that the resulting lack of competition was the "effect" of the Agreements rather than the effect of Westinghouse's patent. *The government bears the burden of showing causation. It must show that some combination or conspiracy between the parties "actually causes injury to competition," . . . in violation of the antitrust laws.* The district court's conclusion that the government failed to show this causal link is amply supported by the record. . . . The desire of [the licensee] to avoid infringing upon Westinghouse's many patents perhaps even as to products only arguably covered by Westinghouse's patents undoubtedly has an effect on competition, but this is an effect *which results from* the monopoly granted by the patent laws and does not establish an antitrust violation by the companies in this case.

*Id.* at 649 (citations omitted) (emphasis added).

As clarified in the quoted passage, the critical issue in *Westinghouse* was whether the Government had satisfied its burden of proof by showing the necessary causal link between the alleged antitrust violation and injury. That is not the issue presented here. Rather, Plaintiffs' motions require this Court to: (1) consider the HMRI/Andrx Agreement and its likely anti-competitive effects; (2) determine whether the challenged Agreement is properly classified as a horizontal market allocation agreement that is susceptible to analysis under the *per se* rule; and if so, (3) apply the *per se* rule and conclude that the restraint of trade created by the Agreement is presumptively unreasonable and thus illegal *per se.*

Defendant HMRI's reliance on *Miller Insituform, Inc. v. Insituform of North America, Inc.*, 830 F.2d 606, 608 (6th Cir. 1987) is likewise misplaced. In *Miller Insituform*, the issue presented was whether an exclusive licensee violated section 2 of the Sherman Act when it terminated an agreement to sublicense a patent. The Sixth Circuit held there was no violation, reasoning that the exclusive licensee had a lawfully acquired patent and was merely exercising its right, granted under the license, to exclude others from using the patented process that was the subject of its exclusive license. Unlike the situation in *Miller Insituform*, there is no termination of a sublicensing agreement at issue here. Plaintiffs do not base their antitrust claims on HMRI's litigation efforts to maintain its monopoly power under the '584 patent. Rather, their antitrust claims challenge as anti-competitive HMRI's and Andrx's Agreement to have Andrx refrain from entering the market with its generic version of Cardizem CD beyond the time when it could have entered the market, to have Andrx refrain from relinquishing or compromising its pending ANDA (which had the practical effect of delaying entry of other generic versions of Cardizem CD into the market), and to have HMRI pay Andrx tens of millions of dollars as long as it complied with these restraints.

The decision in *Dunlop Co., Ltd. v. Kelsey–Hayes Co.*, 484 F.2d 407, 417–18 (6th Cir.1973), also fails to advance HMRI's arguments. In *Dunlop Co.*, the court similarly held that a patent holder, who had the power under its patent to preclude others from marketing its patented product without offending the antitrust laws, could also issue licenses as to its patented products that contained territorial restrictions without violating the antitrust laws. Unlike *Dunlop Co.*, there is no restricted license at issue here that allocates the territorial market for Cardizem C.D. Rather, there is an Agreement between HMRI and Andrx that allocated the entire U.S. market for Cardizem CD and its bioequivalents to HMRI for the life of that Agreement. As discussed more fully *infra*, the Agreement broadly restrains Andrx from marketing not only the allegedly infringing Andrx Product but also other bioequivalent or generic versions of Cardizem CD.

### 3. The HMRI/Andrx Agreement is Not An Agreement Reasonably Ancillary to Pro–Competitive Activity

As further support for their argument that *per se* analysis is inappropriate here, Defendant HMRI argues that the challenged restraints of trade embodied in the HMRI/Andrx Agreement are reasonably ancillary to the Agreement's central pro-competitive purposes and thus must be analyzed under the rule of reason. Andrx, on the other hand, argues that the Agreement "had no anti-competitive effects at all and in fact had demonstrable pro-competitive effects." Andrx Resp.Br. at 26. The Court disagrees with Defendants and is not persuaded that the broad restraints in the HMRI/Andrx Agreement are ancillary to the allegedly pro-competitive provisions Defendants rely upon to advance their position. The plain terms of the Agreement belie Defendants' argument that this Agreement is the product of a cooperative venture designed to enhance competition and facilitate product output in the relevant market. *See Polk Bros., Inc. v. Forest City Enterprises, Inc.*, 776 F.2d 185 (7th Cir.1985).

Defendants identify the following competition-enhancing qualities of the HMRI/Andrx Agreement: (1) it maintained the status quo, allowed HMRI and Andrx to manage their litigation risks, operated like a court-ordered preliminary injunction with a Fed.R.Civ.P.Rule 65(c) bond and thus facilitated and fostered the expeditious resolution of their patent infringement dispute; (2) it protected HMRI's patent rights and provided Andrx with capital to invent around the '584 patent and thus allowed Andrx an opportunity to enter in the market sooner without the risk of patent liability; and (3) it provided Andrx with an opportunity to obtain a license from HMRI that, if exercised,

would allow Andrx to enter the market and compete with HMRI without the risk of patent liability both while the suit was pending (in January 2000, 18 months after Andrx's ANDA obtained FDA approval) and in the event Andrx lost the HMRI/Andrx patent suit. The Court addresses each of these in turn.

First, Defendants' claims that the HMRI/Andrx Agreement merely "settled" HMRI's claim for injunctive relief and maintained the status quo lack merit. The HMRI/Andrx Agreement did not maintain the status quo. HMRI's interim payments to Andrx in the amount of $10 million per quarter negate this claim. More importantly, the restraints imposed by the Agreement exceed those generally available under a court-ordered preliminary injunction: (1) it barred Andrx's entry into the market beyond resolution of the HMRI/Andrx patent suit in the district court; (2) it provided large interim payments to Andrx that created an incentive for Andrx to stay off the market with its generic drug after obtaining FDA approval in contrast to a Rule 65(c) bond, issued at the Court's discretion, to cover damages actually incurred if HMRI was successful in obtaining a preliminary injunction but ultimately unsuccessful in its infringement action; (3) it barred Andrx from relinquishing or compromising its right to the 180–day period of exclusivity it obtained under the Hatch–Waxman Amendments and, in contrast to a court-ordered Rule 65(c) bond, provided large interim payments to Andrx that created an incentive for Andrx not to withdraw, relinquish or otherwise compromise its right to the 180–day period of marketing exclusivity; and (4) it barred Andrx from marketing other bioequivalent or generic versions of Cardizem CD which were not at issue in the pending HMRI/Andrx patent case, including the reformulated generic drug described in Andrx's September 11, 1998 prior approval supplement to its ANDA No. 74–752.[14]

14. HMRI had available the entire 30–month waiting period under Hatch–Waxman in which to seek an injunction. Andrx could not enter the market until that two and one-half year period expired, but HMRI did not seek any such relief in the HMRI/Andrx patent action. Had HMRI sought and obtained injunctive relief, it would have obtained *Noerr–Pennington* immunity, protected its patent, and could have sought a Rule 65(c) bond that, most likely, would not require it to pay interim quarterly payments to Andrx in the amount of $10 million. HMRI, however, did not seek an injunction.

Unlike a court-ordered preliminary injunction, this Agreement was never presented to, filed in, or approved by the court presiding over the HMRI/Andrx patent case. The restraints embodied in the HMRI/Andrx Agreement are the result of a purely private agreement and, as this Court has previously determined, are not immune from antitrust liability under the *Noerr–Pennington* doctrine. *See* Order No. 12, Mem.Op. & Order Denying Defendants' Motions to Dismiss at 25–45. Here, there was no judicial finding that HMRI was likely to succeed on the merits of its infringement suit, that HMRI would suffer irreparable injury, that a balancing of the equities and consideration of the public's interest weighed in favor of granting a preliminary injunction in HMRI's favor, and that a Rule 65(c) bond was warranted in an amount equal to the amounts to be paid out under the HMRI/Andrx Agreement. Rather than seeking an injunction from the court, the parties agreed to keep the terms and existence of the Agreement confidential and further agreed that the Agreement, any drafts, or supporting documents were not to be introduced into evidence in the pending HMRI/Andrx patent action or any other litigation.

As one commentator has observed, "[w]ere one competitor to agree to pay, and to pay, another to leave a business in order to eliminate its competition, all would accept that ordinarily there had been a per se antitrust violation. A similar anti-competitive result can be achieved, in a more innocent-appearing manner, if the patent owner pays money, or gives an infringer some thing of value, to be subject to a patent injunction, especially if the injunction is broader than the claims. Ordinarily, consideration flows the other way; the infringer pays some amount to the patent owner for past infringement and then agrees to be subject to an injunction for the remaining life of the patent, or is granted a license." Robert J. Hoerner, *Antitrust Pitfalls in Patent Litigation Settlement Agreements*, 8 Fed. Circuit B.J. 113, 122 (Summer 1998). "If the patent owner pays the infringer, and if the infringer settles by accepting an injunction, or

Contrary to Defendants' arguments here, the HMRI/Andrx Agreement did not resolve the pending patent claims; the only claims it resolved were Andrx's antitrust and unfair practice claims against HMRI. Rather than facilitating or fostering an expeditious resolution of the HMRI/Andrx patent infringement suit, the Agreement required Andrx to diligently prosecute its ANDA, the very act of infringement that triggered the HMRI/Andrx patent suit. The $10 million quarterly payments also created the incentive to pursue the litigation beyond the district court and through the appellate courts by extending those interim payments until entry of a final and unappealable order or judgment.

Likewise unavailing are Defendants' arguments that the Agreement merely protected HMRI's patent rights and provided Andrx with capital to invent around the '584 patent thus allowing Andrx an opportunity to enter the market sooner without the risk of patent liability. The Agreement barred Andrx from marketing not only the Andrx Product but also other bioequivalent or generic versions of Cardizem CD. *See* HMRI/Andrx Agreement at ¶ 2(A). Moreover, the Agreement defines the "Andrx Product" to include not only the product described in Andrx's original ANDA No. 74–752 but also the product described in any amendment or modification to Andrx's ANDA No. 74–752 not requiring withdrawal of that ANDA or submission of a new ANDA. *Id.* at ¶ 8(B)(iv). The Agreement thus barred Andrx from marketing non-infringing or potentially non-infringing versions of Cardizem CD, including the reformulated generic drug described in Andrx's September 11, 1998 prior approval supplement to its ANDA No. 74–752. Therefore, even assuming that the interim quarterly payments under the Agreement provided Andrx with capital to invent around the '584 patent, the terms of that Agreement still barred Andrx's entry into the market with that reformulated product.

Finally, the Court disagrees with Defendants' arguments that the Agreement's provisions providing Andrx with an option to obtain a license and thus market Cardizem CD without any risk of patent liability make it susceptible to rule of reason rather than *per se* analysis. The Agreement did provide Andrx with an opportunity to obtain a license from HMRI that, if exercised, would allow it to enter the market without the risk of patent liability both while the patent suit was still pending (in January 2000) and in the event Andrx ultimately lost the HMRI/Andrx patent suit. Consideration of the plain language of the HMRI/Andrx Agreement, its restraints and its likely effects, however, lead the Court to conclude that the option to lease and other allegedly pro-competitive provisions of the Agreement do not preclude analysis under the *per se* rule. The Court is not convinced that the restraints embodied in the HMRI/Andrx Agreement are merely ancillary to the allegedly competition-enhancing provisions of that Agreement. Rather, the clear and unambiguous terms of the Agreement indicate that its main thrust was to have Andrx refrain from going to market with its generic version of Cardizem CD beyond the July 8, 1998 date when it could have entered the market, and to have Andrx continue the prosecution of its ANDA (the alleged infringing act) and not otherwise compromise its right to the 180–day exclusivity period (which would delay the entry by others with generic versions of Cardizem CD because, under the scheme of the Hatch–Waxman Amendments, these potential generic competitors would be forced to wait out this exclusivity period before obtaining FDA approval), and to have HMRI pay Andrx tens of millions of dollars as long as Andrx complied. The HMRI/Andrx Agreement, on its face, allocates the entire U.S. market for Cardizem CD and its bioequivalents to HMRI for the life of that Agreement. Accordingly, this Court concludes that it is a naked horizontal market allocation agreement and thus

agrees to abandon the field, scrutiny is war-

ranted." *Id.* at 123.

constitutes a restraint of trade that is illegal *per se* under section 1 of the Sherman Antitrust Act and under the various state antitrust laws at issue here.

As the Supreme Court recently observed, it has "reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition.' Such limitations are per se violations of the Sherman Act." *Palmer*, 498 U.S. at 49, 111 S.Ct. 401 (quoting *Topco*, 405 U.S. at 608, 92 S.Ct. 1126). The Court has further observed that, although § 1 of the Sherman Act "prohibits only agreements that *unreasonably* restrain trade", "certain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anti-competitive in the particular circumstances." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133, 119 S.Ct. 493, 497, 142 L.Ed.2d 510 (1998). "An agreement of such a kind is unlawful *per se.*" *Id.* (citing *Palmer* for the position that horizontal market allocation agreements are *per se* illegal). Accordingly, once the Court decides that an agreement is a kind that is unlawful *per se,* then it becomes irrelevant "whether or not [the Court] would decide this case the same way under the rule of reason." *Topco*, 405 U.S. at 609, 92 S.Ct. 1126. Rather, "the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are well intended or because the are allegedly developed to increase competition." *Id.* at 610, 92 S.Ct. 1126.

#### 4. HMRI/Andrx Agreement's Effect on the Price of Cardizem CD

 The Court rejects Defendants' arguments that the Court cannot consider the HMRI/Andrx Agreement's practical effect on the price of Cardizem CD. The anti-competitive effect of the HMRI/Andrx Agreement is obvious on its face. It restricted competition between HMRI, the brand-name drug manufacturer, and Andrx, the generic drug manufacturer; al-

located the entire U.S. market for Cardizem CD and its bioequivalents to HMRI; and allowed HMRI to maintain or fix the price of Cardizem CD at a non-competitive level during the life of the Agreement. The courts have observed that "the per se ban on price fixing is not limited to an express horizontal agreement setting a uniform price for a product or service. Rather, the Supreme Court jurisprudence on the subject teaches that the courts must look at the challenged horizontal agreement's practical effect on price and competition" and the Court "has ruled repeatedly that price fixing does not have to be direct in order to be actionable." *State by Spitzer v. Saint Francis Hosp.*, 94 F.Supp.2d 399, 410–13 (citing and discussing *Socony–Vacuum Oil Co.; Nat'l Soc'y of Prof'l Engineers v. United States*, 435 U.S. 679, 693–94, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) (where the Supreme Court observed that agreements that interfere with the setting of prices by "free market forces" are illegal on their face and further observed that a ban on competitive pricing does not require an elaborate industry analysis to demonstrate its anti-competitive character); and *Catalano v. Target Sales, Inc.*, 446 U.S. 643, 648–49, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980) (where the Supreme Court similarly observed that, although there was no direct agreement as to prices, "[a]n agreement to terminate the practice of giving credit . . . falls squarely within the traditional *per se* rule against price fixing")). *See also Palmer*, 498 U.S. at 48–49, 111 S.Ct. 401 (observing that "explicit agreement on prices to be charged or that one party have the right to be consulted about the other's prices" was not necessary to constitute an illegal *per se* price fixing agreement).

### V. Conclusion

For the foregoing reasons, Plaintiffs' motions for partial summary judgment are **GRANTED.** The Court concludes that Defendants' September 24, 1997 Agreement constitutes a restraint of trade that is illegal *per se* under section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1, and under the various state antitrust laws at issue here.